KEYSTONE BITUMINOUS COAL ASSN. ET AL. *v.*
DeBENEDICTIS, SECRETARY, PENNSYL-
VANIA DEPARTMENT OF ENVIRON-
MENTAL RESOURCES, ET AL.

No. 85–1092.   Argued November 10, 1986—Decided March 9, 1987

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which POWELL, O'CONNOR, and SCALIA, JJ., joined, *post*, p. 506.

*Rex E. Lee* argued the cause for petitioners. With him on the briefs were *Benjamin W. Heineman, Jr., Michael A. Nemeroff, Carter G. Phillips, Henry McC. Ingram,* and *Thomas C. Reed.*

*Andrew S. Gordon,* Chief Deputy Attorney General of Pennsylvania, argued the cause for respondent. With him on the brief was *LeRoy S. Zimmerman,* Attorney General.*

*Briefs of *amici curiae* urging reversal were filed for the Mid-Atlantic Legal Foundation et al. by *Richard B. McGlynn;* for the National Coal Association et al. by *Harold P. Quinn, Jr.;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun, Robert K. Best,* and *Lucinda Low Swartz.*

JUSTICE STEVENS, delivered the opinion of the Court.

In *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922), the Court reviewed the constitutionality of a Pennsylvania statute that admittedly destroyed "previously existing rights of property and contract." *Id.*, at 413. Writing for the Court, Justice Holmes explained:

> "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act.

Briefs of *amici curiae* urging affirmance were filed for the State of California *ex rel.* John K. Van de Kamp et al. by *Mr. Van de Kamp*, Attorney General of California, *pro se*, *Richard C. Jacobs*, *N. Gregory Taylor*, and *Theodora Berger*, Assistant Attorneys General, *Richard M. Frank*, and *Craig C. Thompson*, and by the Attorneys General for their respective States as follows: *John Steven Clark* of Arkansas, *Jim Smith* of Florida, *Corinne K. A. Watanabe* of Hawaii, *Linley E. Pearson*, of Indiana, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.*, of Louisiana, *Stephen H. Sachs* of Maryland, *Francis X. Bellotti* of Massachusetts, *James E. Tierney* of Maine, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Edwin L. Pittman* of Mississippi, *William L. Webster* of Missouri, *Robert M. Spire* of Nebraska, *Stephen E. Merrill* of New Hampshire, *W. Cary Edwards* of New Jersey, *Robert Abrams* of New York, *Lacy H. Thornburg* of North Carolina, *Michael Turpin* of Oklahoma, *Dave Frohnmayer* of Oregon, *Mark V. Meierhenry* of South Dakota, *W. J. Michael Cody* of Tennessee, *Jeffrey L. Amestoy* of Vermont, *Kenneth O. Eikenberry* of Washington, and *Bronson C. La Follette* of Wisconsin; for the National Conference of State Legislatures et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch*, and *Robert H. Freilich;* and for the Pennsylvania State Grange et al. by *K. W. James Rochow.*

So the question depends upon the particular facts."
*Ibid.*

In that case the "particular facts" led the Court to hold that the Pennsylvania Legislature had gone beyond its constitutional powers when it enacted a statute prohibiting the mining of anthracite coal in a manner that would cause the subsidence of land on which certain structures were located.

Now, 65 years later, we address a different set of "particular facts," involving the Pennsylvania Legislature's 1966 conclusion that the Commonwealth's existing mine subsidence legislation had failed to protect the public interest in safety, land conservation, preservation of affected municipalities' tax bases, and land development in the Commonwealth. Based on detailed findings, the legislature enacted the Bituminous Mine Subsidence and Land Conservation Act (Subsidence Act or Act), Pa. Stat. Ann., Tit. 52, § 1406.1 *et seq.* (Purdon Supp. 1986). Petitioners contend, relying heavily on our decision in *Pennsylvania Coal*, that §§ 4 and 6 of the Subsidence Act and certain implementing regulations violate the Takings Clause, and that § 6 of the Act violates the Contracts Clause of the Federal Constitution. The District Court and the Court of Appeals concluded that *Pennsylvania Coal* does not control for several reasons and that our subsequent cases make it clear that neither § 4 nor § 6 is unconstitutional on its face. We agree.

I

Coal mine subsidence is the lowering of strata overlying a coal mine, including the land surface, caused by the extraction of underground coal. This lowering of the strata can have devastating effects.[1] It often causes substantial dam-

---

[1] See generally Department of the Interior, Lee & Abel, Subsidence from Underground Mining: Environmental Analysis and Planning Considerations, Geological Survey Circular 2–12, p. 876 (1983); P. Mavrolas & M. Schechtman, Coal Mine Subsidence 6–8 (1981); Blazey & Strain, Deep Mine Subsidence—State Law and the Federal Response, 1 Eastern Mineral Law Foundation § 1.01, pp. 1–5 (1980); Department of the Interior, Bureau of Mines, Moebs, Subsidence Over Four Room-and-Pillar Sections in South-

age to foundations, walls, other structural members, and the integrity of houses and buildings. Subsidence frequently causes sinkholes or troughs in land which make the land difficult or impossible to develop. Its effect on farming has been well documented—many subsided areas cannot be plowed or properly prepared. Subsidence can also cause the loss of groundwater and surface ponds.[2] In short, it presents the type of environmental concern that has been the focus of so much federal, state, and local regulation in recent decades.[3]

Despite what their name may suggest, neither of the "full extraction" mining methods currently used in western Pennsylvania[4] enables miners to extract all subsurface coal; considerable amounts need to be left in the ground to provide access, support, and ventilation to the mines. Additionally, mining companies have long been required by various Pennsylvania laws and regulations, the legitimacy of which is not challenged here, to leave coal in certain areas for public safety reasons.[5] Since 1966, Pennsylvania has placed an additional set of restrictions on the amount of coal that may be

western Pennsylvania, R18645 (1982); H. R. Rep. No. 95–218, p. 126 (1977).

[2] "Wherever [subsidence effects] extend, damage can occur to buildings, roads, pipelines, cables, streams, water impoundments, wells, and aquifers. Buildings can be cracked or tilted; roads can be lowered or cracked; streams, water impoundments, and aquifers can all be drained into the underground excavations. Oil and gas wells can be severed, causing their contents to migrate into underground mines, into aquifers, and even into residential basements. Sewage lines, gas lines, and water lines can all be severed, as can telephone and electric cables." Blazey & Strain, *supra*, § 1.01 [2].

[3] Indeed, in 1977, Congress passed the Federal Surface Mining Control and Reclamation Act, 91 Stat. 445, 30 U. S. C. § 1201 *et seq.*, which includes regulation of subsidence caused by underground coal mining. See 30 U. S. C. § 1266.

[4] The two "full extraction" coal mining methods in use in western Pennsylvania are the room and pillar method, and the longwall method. App. 90–91.

[5] For example, Pennsylvania law requires that coal beneath and adjacent to certain large surface bodies of water be left in place. Pa. Stat. Ann., Tit. 52, § 3101 *et seq.* (Purdon 1966).

extracted; these restrictions are designed to diminish subsidence and subsidence damage in the vicinity of certain structures and areas.

Pennsylvania's Subsidence Act authorizes the Pennsylvania Department of Environmental Resources (DER) to implement and enforce a comprehensive program to prevent or minimize subsidence and to regulate its consequences. Section 4 of the Subsidence Act, Pa. Stat. Ann., Tit. 52, § 1406.4 (Purdon Supp. 1986), prohibits mining that causes subsidence damage to three categories of structures that were in place on April 17, 1966: public buildings and noncommercial buildings generally used by the public; dwellings used for human habitation; and cemeteries.[6] Since 1966 the DER has ap-

---

[6] Section 4 provides:

"Protection of surface structures against damage from cave-in, collapse, or subsidence

"In order to guard the health, safety and general welfare of the public, no owner, operator, lessor, lessee, or general manager, superintendent or other person in charge of or having supervision over any bituminous coal mine shall mine bituminous coal so as to cause damage as a result of the caving-in, collapse or subsidence of the following surface structures in place on April 27, 1966, overlying or in the proximity of the mine:

"(1) Any public building or any noncommercial structure customarily used by the public, including but not being limited to churches, schools, hospitals, and municipal utilities or municipal public service operations.

"(2) Any dwelling used for human habitation; and

"(3) Any cemetery or public burial ground; unless the current owner of the structure consents and the resulting damage is fully repaired or compensated."

In response to the enactment in 1977 of the Federal Surface Mining Control and Reclamation Act, 91 Stat. 445, 30 U. S. C. § 1201 *et seq.*, and regulations promulgated by the Secretary of the Interior in 1979, 44 Fed. Reg. 14902, the Pennsylvania DER adopted new regulations extending the statutory protection to additional classes of buildings and surface features. Particularly:

"(a)(1) public buildings and non-commercial buildings customarily used by the public [after April 27, 1966], including churches, schools, hospitals, courthouses, and government offices;

. . . . .

plied a formula that generally requires 50% of the coal beneath structures protected by § 4 to be kept in place as a means of providing surface support.[7]   Section 6 of the Subsidence Act, Pa. Stat. Ann., Tit. 52, § 1406.6 (Purdon Supp. 1986), authorizes the DER to revoke a mining permit if the removal of coal causes damage to a structure or area protected by § 4 and the operator has not within six months either repaired the damage, satisfied any claim arising therefrom, or deposited a sum equal to the reasonable cost of repair with the DER as security.[8]

---

"(4) perennial streams and impoundments of water with the storage volume of 20 acre feet;

"(5) aquifers which serve as a significant source of water supply to any public water system; and

"(6) coal refuse disposa[l]" areas.   25 Pa. Code §§ 89.145(a) and 89.146 (b) (1983).

[7] The regulations define the zone for which the 50% rule applies:

"(2) The support area shall be rectangular in shape and determined by projecting a 15 degree angle of draw from the surface to the coal seam, beginning 15 feet from each side of the structure.   For a structure on a surface slope of 5.0% or greater, the support area on the downslope side of the structure shall be extended an additional distance, determined by multiplying the depth of the overburden by the percentage of the surface slope."   § 89.146(b)(2).

However, this 50% requirement is neither an absolute floor nor ceiling. It may be waived by the Department upon a showing that alternative measures will prevent subsidence damage.   § 89.146(b)(5).   Alternatively, more stringent measures may be imposed, or mining may be prohibited, if it appears that leaving 50% of the coal in place will not provide adequate support.   § 89.146(b)(4).

[8] Although some subsidence eventually occurs over every underground mine, the extent and timing of the subsidence depends upon a number of factors, including the depth of the mining, the geology of the overlying strata, the topography of the surface, and the method of coal removal. The DER believes that the support provided by its 50% rule will last in almost all cases for the life of the structure being protected.   Since 1966, petitioners have mined under approximately 14,000 structures or areas protected by § 4; there have been subsidence damage claims with respect to only 300.   Stipulations of Counsel 41 and 42, App. 90.

## II

In 1982, petitioners filed a civil rights action in the United States District Court for the Western District of Pennsylvania seeking to enjoin officials of the DER from enforcing the Subsidence Act and its implementing regulations. Petitioners are an association of coal mine operators, and four corporations that are engaged, either directly or through affiliates, in underground mining of bituminous coal in western Pennsylvania. The members of the association and the corporate petitioners own, lease, or otherwise control substantial coal reserves beneath the surface of property affected by the Subsidence Act. The defendants in the action, respondents here, are the Secretary of the DER, the Chief of the DER's Division of Mine Subsidence, and the Chief of the DER's Section on Mine Subsidence Regulation.

The complaint alleges that Pennsylvania recognizes three separate estates in land: The mineral estate; the surface estate; and the "support estate." Beginning well over 100 years ago, landowners began severing title to underground coal and the right of surface support while retaining or conveying away ownership of the surface estate. It is stipulated that approximately 90% of the coal that is or will be mined by petitioners in western Pennsylvania was severed from the surface in the period between 1890 and 1920. When acquiring or retaining the mineral estate, petitioners or their predecessors typically acquired or retained certain additional rights that would enable them to extract and remove the coal. Thus, they acquired the right to deposit wastes, to provide for drainage and ventilation, and to erect facilities such as tipples, roads, or railroads, on the surface. Additionally, they typically acquired a waiver of any claims for damages that might result from the removal of the coal.

In the portions of the complaint that are relevant to us, petitioners alleged that both § 4 of the Subsidence Act, as im-

plemented by the 50% rule, and § 6 of the Subsidence Act, constitute a taking of their private property without compensation in violation of the Fifth and Fourteenth Amendments. They also alleged that § 6 impairs their contractual agreements in violation of Article I, § 10, of the Constitution.[9] The parties entered into a stipulation of facts pertaining to petitioners' facial challenge, and filed cross-motions for summary judgment on the facial challenge. The District Court granted respondents' motion.

In rejecting petitioners' Takings Clause claim, the District Court first distinguished *Pennsylvania Coal*, primarily on the ground that the Subsidence Act served valid public purposes that the Court had found lacking in the earlier case. 581 F. Supp. 511, 516 (1984). The District Court found that the restriction on the use of petitioners' property was an exercise of the Commonwealth's police power, justified by Pennsylvania's interest in the health, safety, and general welfare of the public. In answer to petitioners' argument that the Subsidence Act effectuated a taking because a separate, recognized interest in realty—the support estate—had been entirely destroyed, the District Court concluded that under Pennsylvania law the support estate consists of a bundle of rights, including some that were not affected by the Act. That the right to cause damage to the surface may constitute the most valuable "strand" in the bundle of rights possessed by the owner of a support estate was not considered controlling under our decision in *Andrus* v. *Allard*, 444 U. S. 51 (1979).

In rejecting petitioners' Contracts Clause claim, the District Court noted that there was no contention that the Subsi-

---

[9] Petitioners also challenged various other portions of the Subsidence Act below, see 771 F. 2d 707, 718–719 (1985); 581 F. Supp. 511, 513, 519–520 (1984), but have not pursued these claims in this Court.

dence Act or the DER regulations had impaired any contract to which the Commonwealth was a party. Since only private contractual obligations had been impaired, the court considered it appropriate to defer to the legislature's determinations concerning the public purposes served by the legislation. The court found that the adjustment of the rights of the contracting parties was tailored to those "significant and legitimate" public purposes. 581 F. Supp., at 514. At the parties' request, the District Court certified the facial challenge for appeal.

The Court of Appeals affirmed, agreeing that *Pennsylvania Coal* does not control because the Subsidence Act is a legitimate means of "protect[ing] the environment of the Commonwealth, its economic future, and its well-being." 771 F. 2d 707, 715 (1985). The Court of Appeals' analysis of the Subsidence Act's effect on petitioners' property differed somewhat from the District Court's, however. In rejecting the argument that the support estate had been entirely destroyed, the Court of Appeals did not rely on the fact that the support estate itself constitutes a bundle of many rights, but rather considered the support estate as just one segment of a larger bundle of rights that invariably includes either the surface estate or the mineral estate. As Judge Adams explained:

"To focus upon the support estate separately when assessing the diminution of the value of plaintiffs' property caused by the Subsidence Act therefore would serve little purpose. The support estate is more properly viewed as only one 'strand' in the plaintiff's 'bundle' of property rights, which also includes the mineral estate. As the Court stated in *Andrus*, '[t]he destruction of one "strand" of the bundle is not a taking because the aggregate must be viewed in its entirety.' 444 U. S. at 65. . . . The use to which the mine operators wish to put the support estate is forbidden. However, because the plaintiffs still possess valuable mineral rights that enable

them profitably to mine coal, subject only to the Subsidence Act's requirement that they prevent subsidence, their entire 'bundle' of property rights has not been destroyed." *Id.*, at 716.

With respect to the Contracts Clause claim, the Court of Appeals agreed with the District Court that a higher degree of deference should be afforded to legislative determinations respecting economic and social legislation affecting wholly private contracts than when the State impairs its own agreements. The court held that the impairment of private agreements effectuated by the Subsidence Act was justified by the legislative finding "that subsidence damage devastated many surface structures and thus endangered the health, safety, and economic welfare of the Commonwealth and its people." *Id.*, at 718. We granted certiorari, 475 U. S. 1080 (1986), and now affirm.

### III

Petitioners assert that disposition of their takings claim[10] calls for no more than a straightforward application of the Court's decision in *Pennsylvania Coal Co.* v. *Mahon.* Although there are some obvious similarities between the cases, we agree with the Court of Appeals and the District Court that the similarities are far less significant than the differences, and that *Pennsylvania Coal* does not control this case.

In *Pennsylvania Coal,* the Pennsylvania Coal Company had served notice on Mr. and Mrs. Mahon that the company's mining operations beneath their premises would soon reach a point that would cause subsidence to the surface. The Mahons filed a bill in equity seeking to enjoin the coal company from removing any coal that would cause "the caving in, col-

---

[10] "[N]or shall private property be taken for public use, without just compensation." U. S. Const., Amdt. 5. This restriction is applied to the States through the Fourteenth Amendment. See *Chicago B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897).

lapse or subsidence" of their dwelling. The bill acknowl-
edged that the Mahons owned only "the surface or right of
soil" in the lot, and that the coal company had reserved the
right to remove the coal without any liability to the owner of
the surface estate. Nonetheless, the Mahons asserted that
Pennsylvania's then recently enacted Kohler Act of 1921,
P. L. 1198, Pa. Stat. Ann., Tit. 52, § 661 *et seq.* (Purdon
1966), which prohibited mining that caused subsidence under
certain structures, entitled them to an injunction.

After initially having entered a preliminary injunction
pending a hearing on the merits, the Chancellor soon dis-
solved it, observing:

> "[T]he plaintiffs' bill contains no averment on which to
> base by implication or otherwise any finding of fact that
> any interest public or private is involved in the defend-
> ant's proposal to mine the coal except the private inter-
> est of the plaintiffs in the prevention of private injury."
> Tr. of Record in *Pennsylvania Coal* v. *Mahon*, O. T.
> 1922, No. 549, p. 23.

The Pennsylvania Supreme Court reversed, concluding
that the Kohler Act was a proper exercise of the police
power. 274 Pa. 489, 118 A. 491 (1922). One Justice dis-
sented. He concluded that the Kohler Act was not actually
intended to protect lives and safety, but rather was special
legislation enacted for the sole benefit of the surface owners
who had released their right to support. *Id.*, at 512–518, 118
A., at 499–501.

The company promptly appealed to this Court, asserting
that the impact of the statute was so severe that "a serious
shortage of domestic fuel is threatened." Motion to Advance
for Argument in *Pennsylvania Coal* v. *Mahon*, O. T. 1922,
No. 549, p. 3. The company explained that until the Court
ruled, "no anthracite coal which is likely to cause surface sub-
sidence can be mined," and that strikes were threatened

throughout the anthracite coal fields.[11]   In its argument in this Court, the company contended that the Kohler Act was not a bona fide exercise of the police power, but in reality was nothing more than "'robbery under the forms of law'" because its purpose was "not to protect the lives or safety of the public generally but merely to augment the property rights of a favored few."   See 260 U. S., at 396–398, quoting *Loan Assn.* v. *Topeka,* 20 Wall. 655, 664 (1875).

Over Justice Brandeis' dissent, this Court accepted the company's argument.   In his opinion for the Court, Justice Holmes first characteristically decided the specific case at hand in a single, terse paragraph:

> "This is the case of a single private house.   No doubt there is a public interest even in this, as there is in every purchase and sale and in all that happens within the commonwealth.   Some existing rights may be modified even in such a case.   *Rideout* v. *Knox,* 148 Mass. 368.   But usually in ordinary private affairs the public interest does not warrant much of this kind of interference.   A source of damage to such a house is not a public nuisance even if similar damage is inflicted on others in different places.   The damage is not common or public.   *Wesson* v. *Washburn Iron Co.,* 13 Allen, 95, 103.   The extent of the public interest is shown by the statute to be limited, since the statute ordinarily does not apply to land when the surface is owned by the owner of the coal.   Furthermore, it is not justified as a protection of personal safety.   That could be provided for by notice.   Indeed the very foundation of this bill is that the defendant gave timely notice of its intent to mine under the house.   On the other hand the extent of the taking is great.   It purports to abolish what is recognized in Pennsylvania as an es-

---

[11] The urgency with which the case was treated is evidenced by the fact that the Court issued its decision less than a month after oral argument; a little over a year after the test case had been commenced.

tate in land—a very valuable estate—and what is de-
clared by the Court below to be a contract hitherto bind-
ing the plaintiffs. If we were called upon to deal with
the plaintiffs' position alone, we should think it clear that
the statute does not disclose a public interest sufficient
to warrant so extensive a destruction of the defendant's
constitutionally protected rights." 260 U. S., at 413–
414.

Then—uncharacteristically—Justice Holmes provided the
parties with an advisory opinion discussing "the general va-
lidity of the Act." [12] In the advisory portion of the Court's
opinion, Justice Holmes rested on two propositions, both crit-
ical to the Court's decision. First, because it served only
private interests, not health or safety, the Kohler Act could
not be "sustained as an exercise of the police power." *Id.*,
at 414. Second, the statute made it "commercially imprac-
ticable" to mine "certain coal" in the areas affected by the
Kohler Act. [13]

The holdings and assumptions of the Court in *Pennsylva-
nia Coal* provide obvious and necessary reasons for distin-
guishing *Pennsylvania Coal* from the case before us today.

[12] "But the case has been treated as one in which the general validity of
the act should be discussed. The Attorney General of the State, the City
of Scranton, and the representatives of other extensive interests were
allowed to take part in the argument below and have submitted their con-
tentions here. It seems, therefore, to be our duty to go farther in the
statement of our opinion, in order that it may be known at once, and that
further suits should not be brought in vain." 260 U. S., at 414.

[13] "What makes the right to mine coal valuable is that it can be exercised
with profit. To make it commercially impracticable to mine certain coal
has very nearly the same effect for constitutional purposes as appropriat-
ing or destroying it. This we think that we are warranted in assuming
that the statute does." *Id.*, at 414–415.

This assumption was not unreasonable in view of the fact that the Kohler
Act may be read to prohibit mining that causes any subsidence—not just
subsidence that results in damage to surface structures. The record in
this case indicates that subsidence will almost always occur eventually.
See n. 8, *supra*.

The two factors that the Court considered relevant, have become integral parts of our takings analysis. We have held that land use regulation can effect a taking if it "does not substantially advance legitimate state interests, . . . or denies an owner economically viable use of his land." *Agins* v. *Tiburon*, 447 U. S. 255, 260 (1980) (citations omitted); see also *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 124 (1978). Application of these tests to petitioners' challenge demonstrates that they have not satisfied their burden of showing that the Subsidence Act constitutes a taking. First, unlike the Kohler Act, the character of the governmental action involved here leans heavily against finding a taking; the Commonwealth of Pennsylvania has acted to arrest what it perceives to be a significant threat to the common welfare. Second, there is no record in this case to support a finding, similar to the one the Court made in *Pennsylvania Coal*, that the Subsidence Act makes it impossible for petitioners to profitably engage in their business, or that there has been undue interference with their investment-backed expectations.

*The Public Purpose*

Unlike the Kohler Act, which was passed upon in *Pennsylvania Coal*, the Subsidence Act does not merely involve a balancing of the private economic interests of coal companies against the private interests of the surface owners. The Pennsylvania Legislature specifically found that important public interests are served by enforcing a policy that is designed to minimize subsidence in certain areas. Section 2 of the Subsidence Act provides:

> "This act shall be deemed to be an exercise of the police powers of the Commonwealth for the protection of the health, safety and general welfare of the people of the Commonwealth, by providing for the conservation of surface land areas which may be affected in the mining of bituminous coal by methods other than 'open pit' or

'strip' mining, to aid in the protection of the safety of the public, to enhance the value of such lands for taxation, to aid in the preservation of surface water drainage and public water supplies and generally to improve the use and enjoyment of such lands and to maintain primary jurisdiction over surface coal mining in Pennsylvania." Pa. Stat. Ann., Tit. 52, § 1406.2 (Purdon Supp. 1986).

The District Court and the Court of Appeals were both convinced that the legislative purposes[14] set forth in the statute were genuine, substantial, and legitimate, and we have no reason to conclude otherwise.[15]

None of the indicia of a statute enacted solely for the benefit of private parties identified in Justice Holmes' opinion are present here. First, Justice Holmes explained that the Kohler Act was a "private benefit" statute since it "ordinarily does not apply to land when the surface is owned by the owner of the coal." 260 U. S., at 414. The Subsidence Act, by contrast, has no such exception. The current surface owner may only waive the protection of the Act if the DER consents. See 25 Pa. Code § 89.145(b) (1983). Moreover, the Court was forced to reject the Commonwealth's safety justification for the Kohler Act because it found that the Commonwealth's interest in safety could as easily have been accomplished through a notice requirement to landowners. The Subsidence Act, by contrast, is designed to accomplish a number of widely varying interests, with reference to which petitioners have not suggested alternative methods through which the Commonwealth could proceed.

Petitioners argue that at least § 6, which requires coal companies to repair subsidence damage or pay damages to those

---

[14] The legislature also set forth rather detailed findings about the dangers of subsidence and the need for legislation. See Pa. Stat. Ann., Tit. 52, § 1406.3 (Purdon Supp. 1986).

[15] "We are not disposed to displace the considered judgment of the Court of Appeals on an issue whose resolution is so contingent upon an analysis of state law." *Runyon* v. *McCrary,* 427 U. S. 160, 181 (1976).

who suffer subsidence damage, is unnecessary because the Commonwealth administers an insurance program that adequately reimburses surface owners for the cost of repairing their property. But this argument rests on the mistaken premise that the statute was motivated by a desire to protect private parties. In fact, however, the public purpose that motivated the enactment of the legislation is served by preventing the damage from occurring in the first place—in the words of the statute—"by providing for the conservation of surface land areas." Pa. Stat. Ann., Tit. 52, § 1406.2 (Purdon Supp. 1986). The requirement that the mine operator assume the financial responsibility for the repair of damaged structures deters the operator from causing the damage at all—the Commonwealth's main goal—whereas an insurance program would merely reimburse the surface owner after the damage occurs.[16]

Thus, the Subsidence Act differs from the Kohler Act in critical and dispositive respects. With regard to the Kohler Act, the Court believed that the Commonwealth had acted only to ensure against damage to some private landowners' homes. Justice Holmes stated that if the private individuals needed support for their structures, they should not have

---

[16] We do not suggest that courts have "a license to judge the effectiveness of legislation," *post*, at 511, n. 3, or that courts are to undertake "least restrictive alternative" analysis in deciding whether a state regulatory scheme is designed to remedy a public harm or is instead intended to provide private benefits. That a land use regulation may be somewhat overinclusive or underinclusive is, of course, no justification for rejecting it. See *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 388–389 (1926). But, on the other hand, *Pennsylvania Coal* instructs courts to examine the operative provisions of a statute, not just its stated purpose, in assessing its true nature. In *Pennsylvania Coal*, that inquiry led the Court to reject the Pennsylvania Legislature's stated purpose for the statute, because the "extent of the public interest is shown by the statute to be limited." 260 U. S., at 413–414. In this case, we, the Court of Appeals, and the District Court, have conducted the same type of inquiry the Court in *Pennsylvania Coal* conducted, and have determined that the details of the statute do not call the stated public purposes into question.

"take[n] the risk of acquiring only surface rights." 260 U. S., at 416. Here, by contrast, the Commonwealth is acting to protect the public interest in health, the environment, and the fiscal integrity of the area. That private individuals erred in taking a risk cannot estop the Commonwealth from exercising its police power to abate activity akin to a public nuisance. The Subsidence Act is a prime example that "circumstances may so change in time . . . as to clothe with such a [public] interest what at other times . . . would be a matter of purely private concern." *Block* v. *Hirsh*, 256 U. S. 135, 155 (1921).

In *Pennsylvania Coal* the Court recognized that the nature of the State's interest in the regulation is a critical factor in determining whether a taking has occurred, and thus whether compensation is required.[17] The Court distinguished the case before it from a case it had decided eight years earlier, *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531 (1914). There, "it was held competent for the legislature to require a pillar of coal to be left along the line of adjoining property." *Pennsylvania Coal*, 260 U. S., at 415. Justice Holmes explained that unlike the Kohler Act, the statute challenged in *Plymouth Coal* dealt with "a requirement for the safety of employees invited into the mine, and secured an average reciprocity of advantage that has been recognized as a justification of various laws." 260 U. S., at 415.

Many cases before and since *Pennsylvania Coal* have recognized that the nature of the State's action is critical in takings analysis.[18] In *Mugler* v. *Kansas*, 123 U. S. 623

---

[17] In his dissent, Justice Brandeis argued that the State has an absolute right to prohibit land use that amounts to a public nuisance. *Id.*, at 417. Justice Holmes' opinion for the Court did not contest that proposition, but instead took issue with Justice Brandeis' conclusion that the Kohler Act represented such a prohibition. *Id.*, at 413–414.

[18] Of course, the type of taking alleged is also an often critical factor. It is well settled that a "'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, see, *e. g., United States* v. *Causby*, 328 U. S. 256 (1946), than

(1887), for example, a Kansas distiller who had built a brewery while it was legal to do so challenged a Kansas constitutional amendment which prohibited the manufacture and sale of intoxicating liquors. Although the Court recognized that the "buildings and machinery constituting these breweries are of little value" because of the Amendment, *id.*, at 657, Justice Harlan explained that a

> "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property . . . . The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." *Id.*, at 668–669.

---

when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Tranportation Co.* v. *New York City*, 438 U. S. 104, 124 (1978). While the Court has almost invariably found that the permanent physical occupation of property constitutes a taking, see *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 435–438 (1982), the Court has repeatedly upheld regulations that destroy or adversely affect real property interests. See, *e. g.*, *Connolly* v. *Pension Benefit Guaranty Corporation*, 475 U. S. 211 (1986); *Penn Central Transportation Co.* v. *New York City*, 438 U. S., at 125; *Eastlake* v. *Forest City Enterprises, Inc.*, 426 U. S. 668, 674, n. 8 (1976); *Goldblatt* v. *Hempstead*, 369 U. S. 590, 592–593 (1962); *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926); *Gorieb* v. *Fox*, 274 U. S. 603, 608 (1927); *Welch* v. *Swasey*, 214 U. S. 91 (1909). This case, of course, involves land use regulation, not a physical appropriation of petitioners' property.

See also *Plymouth Coal Co.*, *supra; Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915); *Reinman* v. *Little Rock*, 237 U. S. 171 (1915); *Powell* v. *Pennsylvania*, 127 U. S. 678 (1888).

We reject petitioners' implicit assertion that *Pennsylvania Coal* overruled these cases which focused so heavily on the nature of the State's interest in the regulation. Just five years after the *Pennsylvania Coal* decision, Justice Holmes joined the Court's unanimous decision in *Miller* v. *Schoene*, 276 U. S. 272 (1928), holding that the Takings Clause did not require the State of Virginia to compensate the owners of cedar trees for the value of the trees that the State had ordered destroyed. The trees needed to be destroyed to prevent a disease from spreading to nearby apple orchards, which represented a far more valuable resource. In upholding the state action, the Court did not consider it necessary to "weigh with nicety the question whether the infected cedars constitute a nuisance according to common law; or whether they may be so declared by statute." *Id.*, at 280. Rather, it was clear that the State's exercise of its police power to prevent the impending danger was justified, and did not require compensation. See also *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926); *Omnia Commercial Co.* v. *United States*, 261 U. S. 502, 509 (1923). Other subsequent cases reaffirm the important role that the nature of the state action plays in our takings analysis. See *Goldblatt* v. *Hempstead*, 369 U. S. 590 (1962); *Consolidated Rock Products Co.* v. *Los Angeles*, 57 Cal. 2d 515, 370 P. 2d 342, appeal dism'd, 371 U. S. 36 (1962). As the Court explained in *Goldblatt:* "Although a comparison of values before and after" a regulatory action "is relevant, . . . it is by no means conclusive . . . ." 369 U. S., at 594.[19]

---

[19] See also *Agins* v. *Tiburon*, 447 U. S. 255, 261 (1980) (the question whether a taking has occurred "necessarily requires a weighing of private and public interests"); *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 163 (1980) ("No police power justification is offered for the deprivation").

The Court's hesitance to find a taking when the State merely restrains uses of property that are tantamount to public nuisances is consistent with the notion of "reciprocity of advantage" that Justice Holmes referred to in *Pennsylvania Coal*.[20] Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others.[21] See *Penn Central Transportation Co.* v. *New York City*, 438 U. S., at 144–150 (REHNQUIST, J., dissenting); cf. *California Reduction Co.* v. *Sanitary Reduction Works*, 199 U. S. 306, 322 (1905). These restrictions are "properly treated as part of the burden of common citizenship." *Kimball Laundry Co.* v. *United States*, 338 U. S. 1, 5 (1949). Long ago it was recognized that "all property in

---

[20] The special status of this type of state action can also be understood on the simple theory that since no individual has a right to use his property so as to create a nuisance or otherwise harm others, the State has not "taken" anything when it asserts its power to enjoin the nuisance-like activity. Cf. Sax, Takings, Private Property and Public Rights, 81 Yale L. J. 149, 155–161 (1971); Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1235–1237 (1967).

However, as the current CHIEF JUSTICE has explained: "The nuisance exception to the taking guarantee is not coterminous with the police power itself." *Penn Central Transportation Co.*, 438 U. S., at 145 (REHNQUIST, J., dissenting). This is certainly the case in light of our recent decisions holding that the "scope of the 'public use' requirement of the Takings Clause is 'coterminous with the scope of a sovereign's police powers.'" See *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1014 (1984) (quoting *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 240 (1984)). See generally R. Epstein, Takings 108–112 (1985).

[21] The Takings Clause has never been read to require the States or the courts to calculate whether a specific individual has suffered burdens under this generic rule in excess of the benefits received. Not every individual gets a full dollar return in benefits for the taxes he or she pays; yet, no one suggests that an individual has a right to compensation for the difference between taxes paid and the dollar value of benefits received.

this country is held under the implied obligation that the owner's use of it shall not be injurious to the community," *Mugler* v. *Kansas*, 123 U. S., at 665; see also *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 32 (1878), and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.[22] See *Mugler*, 123 U. S., at 664.

In *Agins* v. *Tiburon*, we explained that the "determination that governmental action constitutes a taking, is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest," and we recognized that this question "necessarily requires a weighing of private and public interests." 447 U. S., at 260–261. As the cases discussed above demonstrate, the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation. The Subsidence Act, unlike the Kohler Act, plainly seeks to further such an interest. Nonetheless, we need not rest our decision on this factor alone, because petitioners have also failed to make a

---

[22] Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance. See *Nassr* v. *Commonwealth*, 394 Mass. 767, 477 N. E. 2d 987 (1985) (hazardous waste operation); *Kuban* v. *McGimsey*, 96 Nev. 105, 605 P. 2d 623 (1980) (brothel); *MacLeod* v. *Takoma Park*, 257 Md. 477, 263 A. 2d 581 (1970) (unsafe building); *Eno* v. *Burlington*, 125 Vt. 8, 209 A. 2d 499 (1965) (fire and health hazard); *Pompano Horse Club, Inc.* v. *State ex rel. Bryan*, 93 Fla. 415, 111 So. 801 (1927) (gambling facility); *People ex rel. Thrasher* v. *Smith*, 275 Ill. 256, 114 N. E. 31 (1916) ("bawdyhouse"). It is hard to imagine a different rule that would be consistent with the maxim "*sic utere tuo ut alienum non laedas*" (use your own property in such manner as not to injure that of another). See generally *Empire State Insurance Co.* v. *Chafetz*, 278 F. 2d 41 (CA5 1960). As Professor Epstein has recently commented: "The issue of compensation cannot arise until the question of justification has been disposed of. In the typical nuisance prevention case, this question is resolved against the claimant." Epstein, *supra*, at 199.

showing of diminution of value sufficient to satisfy the test set forth in *Pennsylvania Coal* and our other regulatory takings cases.

### Diminution of Value and Investment-Backed Expectations

The second factor that distinguishes this case from *Pennsylvania Coal* is the finding in that case that the Kohler Act made mining of "certain coal" commercially impracticable. In this case, by contrast, petitioners have not shown any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking. For this reason, their takings claim must fail.

In addressing petitioners' claim we must not disregard the posture in which this case comes before us. The District Court granted summary judgment to respondents only on the facial challenge to the Subsidence Act. The court explained that "[b]ecause plaintiffs have not alleged any injury due to the enforcement of the statute, there is as yet no concrete controversy regarding the application of the specific provisions and regulations. Thus, *the only question before this court is whether the mere enactment of the statutes and regulations constitutes a taking.*" 581 F. Supp., at 513 (emphasis added). The next phase of the case was to be petitioners' presentation of evidence about the actual effects the Subsidence Act had and would have on them. Instead of proceeding in this manner, however, the parties filed a joint motion asking the court to certify the facial challenge for appeal. The parties explained that an assessment of the actual impact that the Act has on petitioners' operations "will involve complex and voluminous proofs," which neither party was currently in a position to present, App. 15–17, and stressed that if an appellate court were to reverse the District Court on the facial challenge, then all of their expenditures in adjudicating the as-applied challenge would be wasted. Based

on these considerations, the District Court certified three questions relating to the facial challenge.[23]

The posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation. This point is illustrated by our decision in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981), in which we rejected a preenforcement challenge to the constitutionality of the Surface Mining Control and Reclamation Act of 1977. We concluded that the District Court had been mistaken in its reliance on *Pennsylvania Coal* as support for a holding that two statutory provisions were unconstitutional because they deprived coal mine operators of the use of their land. The Court explained:

> "[T]he court below ignored this Court's oft-repeated admonition that the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary. See *Socialist Labor Party* v. *Gilligan*, 406 U. S. 583, 588 (1972); *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 568–575, 584 (1947); *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, 461 (1945). Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property. Just last Term, we reaffirmed:

[23] The certified questions asked whether §§ 4, 5, or 6 of the Subsidence Act, and various regulations:

"1. Violate the Rule of the *Mahon* Decision[,]

"2. Constitute *Per Se* Takings,

"3. Violate Article I, § 10 of the Constitution of the United States." App. 12.

The Court of Appeals recognized the limited nature of its inquiry, pointing out that it was passing only on the facial challenge, and that the "as-applied challenge remains for disposition in the district court." 771 F. 2d, at 710, n. 3.

" '[T]his Court has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Rather, it has examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors — such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action — that have particular significance.' *Kaiser Aetna* v. *United States,* 444 U. S. 164, 175 (1979) (citations omitted).

"These 'ad hoc, factual inquiries' must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances.

"Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land.   Thus, the only issue properly before the District Court and, in turn, this Court, is whether the 'mere enactment' of the Surface Mining Act constitutes a taking.   See *Agins* v. *Tiburon,* 447 U. S. 255, 260 (1980).   The test to be applied in considering this facial challenge is fairly straightforward.   A statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land . . . .'  *Agins* v. *Tiburon, supra,* at 260; see also *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978)."   452 U. S., at 295–296.

Petitioners thus face an uphill battle in making a facial attack on the Act as a taking.

The hill is made especially steep because petitioners have not claimed, at this stage, that the Act makes it commercially

impracticable for them to continue mining their bituminous coal interests in western Pennsylvania. Indeed, petitioners have not even pointed to a single mine that can no longer be mined for profit. The only evidence available on the effect that the Subsidence Act has had on petitioners' mining operations comes from petitioners' answers to respondents' interrogatories. Petitioners described the effect that the Subsidence Act had from 1966–1982 on 13 mines that the various companies operate, and claimed that they have been required to leave a bit less than 27 million tons of coal in place to support § 4 areas. The total coal in those 13 mines amounts to over 1.46 billion tons. See App. 284. Thus § 4 requires them to leave less than 2% of their coal in place.[24] But, as we have indicated, nowhere near all of the underground coal is extractable even aside from the Subsidence Act. The categories of coal that must be left for § 4 purposes and other purposes are not necessarily distinct sets, and there is no information in the record as to how much coal is actually left in the ground *solely* because of § 4. We do know, however, that petitioners have never claimed that their mining operations, or even any specific mines, have been unprofitable since the Subsidence Act was passed. Nor is there evidence that mining in any specific location affected by the 50% rule has been unprofitable.

Instead, petitioners have sought to narrowly define certain segments of their property and assert that, when so defined, the Subsidence Act denies them economically viable use. They advance two alternative ways of carving their property in order to reach this conclusion. First, they focus on the specific tons of coal that they must leave in the ground under

---

[24] The percentage of the total that must be left in place under § 4 is not the same for every mine because of the wide variation in the extent of surface development in different areas. For 7 of the 13 mines identified in the record, 1% or less of the coal must remain in place; for 3 others, less than 3% must be left in place; for the other 3, the percentages are 4%, 7.8%, and 9.4%. See App. 284.

the Subsidence Act, and argue that the Commonwealth has effectively appropriated this coal since it has no other useful purpose if not mined. Second, they contend that the Commonwealth has taken their separate legal interest in property—the "support estate."

Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property "whose value is to furnish the denominator of the fraction." Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1192 (1967).[25] In *Penn Central* the Court explained:

> " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature of the interference with rights *in the parcel as a whole*— here the city tax block designated as the 'landmark site.' " 438 U. S., at 130–131.

Similarly, in *Andrus* v. *Allard,* 444 U. S. 51 (1979), we held that "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking because the aggregate must be viewed in its entirety." *Id.*, at 65–66. Although these verbal formulizations do not solve all of the definitional issues that may arise in defining the relevant mass of property, they do provide sufficient guidance to compel us to reject petitioners' arguments.

---

[25] See also Sax, Takings and the Police Power, 74 Yale L. J. 36, 60 (1964); Rose, *Mahon* Reconstructed: Why the Takings Issue is Still a Muddle, 57 S. Cal. L. Rev. 561, 566–567 (1984).

*The Coal in Place*

The parties have stipulated that enforcement of the DER's 50% rule will require petitioners to leave approximately 27 million tons of coal in place. Because they own that coal but cannot mine it, they contend that Pennsylvania has appropriated it for the public purposes described in the Subsidence Act.

This argument fails for the reason explained in *Penn Central* and *Andrus*. The 27 million tons of coal do not constitute a separate segment of property for takings law purposes. Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property. A requirement that a building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area as readily as the requirement that coal pillars be left in place. Similarly, under petitioners' theory one could always argue that a setback ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes. Cf. *Gorieb* v. *Fox*, 274 U. S. 603 (1927) (upholding validity of setback ordinance) (Sutherland, J.). There is no basis for treating the less than 2% of petitioners' coal as a separate parcel of property.

We do not consider Justice Holmes' statement that the Kohler Act made mining of "certain coal" commercially impracticable as requiring us to focus on the individual pillars of coal that must be left in place. That statement is best understood as referring to the Pennsylvania Coal Company's assertion that it could not undertake profitable anthracite coal mining in light of the Kohler Act. There were strong assertions in the record to support that conclusion. For example, the coal company claimed that one company was "unable to operate six large collieries in the city of Scranton, employing more than five thousand men." Motion to Advance for Ar-

gument in *Pennsylvania Coal Co.* v. *Mahon*, O. T. 1922, No. 549, p. 2.[26]   As Judge Adams explained:

> "At first blush, this language seems to suggest that the Court would have found a taking no matter how little of the defendants' coal was rendered unmineable—that because 'certain' coal was no longer accessible, there had been a taking of that coal.   However, when one reads the sentence in context, it becomes clear that the Court's concern was with whether the defendants' 'right to mine coal . . . [could] be exercised *with profit.*'   260 U. S. at 414 (emphasis added). . . . Thus, the Court's holding in *Mahon* must be assumed to have been based on its understanding that the Kohler Act rendered the business of mining coal unprofitable."   771 F. 2d, at 716, n. 6.

When the coal that must remain beneath the ground is viewed in the context of any reasonable unit of petitioners' coal mining operations and financial-backed expectations, it is plain that petitioners have not come close to satisfying their burden of proving that they have been denied the economically viable use of that property.   The record indicates that only about 75% of petitioners' underground coal can be profitably mined in any event, and there is no showing that petitioners' reasonable "investment-backed expectations" have been materially affected by the additional duty to retain the small percentage that must be used to support the structures protected by § 4.[27]

---

[26] Of course, the company also argued that the Subsidence Act made it commercially impracticable to mine the very coal that had to be left in place.   Although they could have constructed pillars for support in place of the coal, the cost of the artificial pillars would have far exceeded the value of the coal.   See Brief for Plaintiff in Error in *Pennsylvania Coal* v. *Mahon*, O. T. 1922, No. 549, pp. 7–9.

[27] We do not suggest that the State may physically appropriate relatively small amounts of private property for its own use without paying just compensation.   The question here is whether there has been any taking at all when no coal has been physically appropriated, and the regulatory pro-

## The Support Estate

Pennsylvania property law is apparently unique in regarding the support estate as a separate interest in land that can be conveyed apart from either the mineral estate or the surface estate.[28] Petitioners therefore argue that even if comparable legislation in another State would not constitute a taking, the Subsidence Act has that consequence because it entirely destroys the value of their unique support estate. It is clear, however, that our takings jurisprudence forecloses reliance on such legalistic distinctions within a bundle of property rights. For example, in *Penn Central*, the Court rejected the argument that the "air rights" above the terminal constituted a separate segment of property for Takings Clause purposes. 438 U. S., at 130. Likewise, in *Andrus* v. *Allard*, we viewed the right to sell property as just one element of the owner's property interest. 444 U. S., at 65–66. In neither case did the result turn on whether state law allowed the separate sale of the segment of property.

The Court of Appeals, which is more familiar with Pennsylvania law than we are, concluded that as a practical matter the support estate is always owned by either the owner of the surface or the owner of the minerals. It stated:

> "The support estate consists of the right to remove the strata of coal and earth that undergird the surface or to leave those layers intact to support the surface and prevent subsidence. These two uses cannot co-exist and, depending upon the purposes of the owner of the support

gram places a burden on the use of only a small fraction of the property that is subjected to regulation. See generally n. 18, *supra*.

[28] See *Charnetski* v. *Miners Mills Coal Mining Co.*, 270 Pa. 459, 113 A. 683 (1921); *Penman* v. *Jones*, 256 Pa. 416 (1917); *Captline* v. *County of Allegheny*, 74 Pa. Commw. 85, 459 A. 2d 1298 (1983), cert. denied, 466 U. S. 904 (1984); see generally Montgomery, The Development of the Right of Subjacent Support and the "Third Estate" in Pennsylvania, 25 Temple L. Q. 1 (1951).

estate, one use or the other must be chosen. If the owner is a mine operator, the support estate is used to exploit the mineral estate. When the right of support is held by the surface owner, its use is to support that surface and prevent subsidence. Thus, although Pennsylvania law does recognize the support estate as a 'separate' property interest, *id.*, it cannot be used profitably by one who does not also possess either the mineral estate or the surface estate. *See* Montgomery, *The Development of the Right of Subjacent Support and the 'Third Estate in Pennsylvania,'* 25 Temple L. Q. 1, 21 (1951)." 771 F. 2d, at 715–716.

Thus, in practical terms, the support estate has value only insofar as it protects or enhances the value of the estate with which it is associated. Its value is merely a part of the entire bundle of rights possessed by the owner of either the coal or the surface. Because petitioners retain the right to mine virtually all of the coal in their mineral estates, the burden the Act places on the support estate does not constitute a taking. Petitioners may continue to mine coal profitably even if they may not destroy or damage surface structures at will in the process.

But even if we were to accept petitioners' invitation to view the support estate as a distinct segment of property for "takings" purposes, they have not satisfied their heavy burden of sustaining a facial challenge to the Act. Petitioners have acquired or retained the support estate for a great deal of land, only part of which is protected under the Subsidence Act, which, of course, deals with subsidence in the immediate vicinity of certain structures, bodies of water, and cemeteries. See n. 6, *supra.* The record is devoid of any evidence on what percentage of the purchased support estates, either in the aggregate or with respect to any individual estate, has been affected by the Act. Under these circumstances, peti-

tioners' facial attack under the Takings Clause must surely fail.[29]

## IV

In addition to their challenge under the Takings Clause, petitioners assert that § 6 of the Subsidence Act violates the Contracts Clause by not allowing them to hold the surface owners to their contractual waiver of liability for surface damage. Here too, we agree with the Court of Appeals and the District Court that the Commonwealth's strong public interests in the legislation are more than adequate to justify the impact of the statute on petitioners' contractual agreements.

Prior to the ratification of the Fourteenth Amendment, it was Article I, § 10, that provided the primary constitutional check on state legislative power. The first sentence of that section provides:

> "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold or silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility." U. S. Const., Art. I, § 10.

Unlike other provisions in the section, it is well settled that the prohibition against impairing the obligation of contracts is not to be read literally. *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426, 433 (1934). The context in which the Contracts Clause is found, the historical setting in which it was

---

[29] Another unanswered question about the level of diminution involves the District Court's observation that the support estate carries with it far more than the right to cause subsidence damage without liability. See 581 F. Supp., at 519. There is no record as to what value these other rights have and it is thus impossible to say whether the regulation of subsidence damage under certain structures, and the imposition of liability for damage to certain structures, denies petitioners the economically viable use of the support estate, even if viewed as a distinct segment of property.

adopted,[30] and our cases construing the Clause, indicate that its primary focus was upon legislation that was designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy.   See *e. g., ibid.; Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 (1934). Even in such cases, the Court has refused to give the Clause a literal reading.   Thus, in the landmark case of *Home Building & Loan Assn.* v. *Blaisdell,* the Court upheld Minnesota's statutory moratorium against home foreclosures, in part, because the legislation was addressed to the "legitimate end" of protecting "a basic interest of society," and not just for the advantage of some favored group.   *Id.,* at 445.

As Justice Stewart explained:

"[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States.   'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.   This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.'   *Manigault* v. *Springs,* 199 U. S. 473, 480.   As Mr. Justice

---

[30] "It was made part of the Constitution to remedy a particular social evil—the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts—and thus was intended to prohibit States from adopting 'as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them,' *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 439 (1934)." *Allied Structural Steel Co.* v. *Spannaus,* 438 U. S. 234, 256 (1978) (BRENNAN, J., dissenting).

Holmes succinctly put the matter in his opinion for the Court in *Hudson Water Co.* v. *McCarter*, 209 U. S. 349, 357: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter.'" *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234, 241–242 (1978).

In assessing the validity of petitioners' Contracts Clause claim in this case, we begin by identifying the precise contractual right that has been impaired and the nature of the statutory impairment. Petitioners claim that they obtained damages waivers for a large percentage of the land surface protected by the Subsidence Act, but that the Act removes the surface owners' contractual obligations to waive damages. We agree that the statute operates as "a substantial impairment of a contractual relationship," *id.*, at 244, and therefore proceed to the asserted justifications for the impairment.[31]

The record indicates that since 1966 petitioners have conducted mining operations under approximately 14,000 structures protected by the Subsidence Act. It is not clear whether that number includes the cemeteries and water courses under which mining has been conducted. In any event, it is petitioners' position that, because they contracted

---

[31] As we have mentioned above, we do not know what percentage of petitioners' acquired support estate is in fact restricted under the Subsidence Act. See *supra*, at 501–502. Moreover, we have no basis on which to conclude just how substantial a part of the support estate the waiver of liability is. See *id.*, at n. 29. These inquiries are both essential to determine the "severity of the impairment," which in turn affects "the level of scrutiny to which the legislation will be affected." *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 411 (1983). While these dearths in the record might be critical in some cases, they are not essential to our discussion here because the Subsidence Act withstands scrutiny even if it is assumed that it constitutes a total impairment.

with some previous owners of property generations ago,[32] they have a constitutionally protected legal right to conduct their mining operations in a way that would make a shambles of all those buildings and cemeteries. As we have discussed, the Commonwealth has a strong public interest in preventing this type of harm, the environmental effect of which transcends any private agreement between contracting parties.

Of course, the finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations. A court must also satisfy itself that the legislature's "adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 412 (1983) (quoting *United States Trust Co.* v. *New Jersey*, 431 U. S. 1, 22 (1977)). But, we have repeatedly held that unless the State is itself a contracting party, courts should "'properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" *Energy Reserves Group, Inc.*, 459 U. S., at 413 (quoting *United States Trust Co.*, 431 U. S., at 23).

---

[32] Most of these waivers were obtained over 70 years ago as part of the support estate which was itself obtained or retained as an incident to the acquisition or retention of the right to mine large quantities of underground coal. No question of enforcement of such a waiver against the original covenantor is presented; rather, petitioners claim a right to enforce the waivers against subsequent owners of the surface. This claim is apparently supported by Pennsylvania precedent holding that these waivers run with the land. See *Kormuth* v. *United States Steel Co.*, 379 Pa. 365, 108 A. 2d 907 (1954); *Scranton* v. *Phillips*, 94 Pa. 15, 22 (1880). That the Pennsylvania courts might have had, or may in the future have, a valid basis for refusing to enforce these perpetual covenants against subsequent owners of the surface rights is not necessarily a sufficient reason for concluding that the legislative impairment of the contracts is permissible. See *Tidal Oil Co.* v. *Flanagan*, 263 U. S. 444 (1924); *Central Land Co.* v. *Laidley*, 159 U. S. 103 (1895) (distinguishing legislative and judicial action).

As we explained more fully above, the Subsidence Act plainly survives scrutiny under our standards for evaluating impairments of private contracts.[33]   The Commonwealth has determined that in order to deter mining practices that could have severe effects on the surface, it is not enough to set out guidelines and impose restrictions, but that imposition of liability is necessary.   By requiring the coal companies either to repair the damage or to give the surface owner funds to repair the damage, the Commonwealth accomplishes both deterrence and restoration of the environment to its previous condition.   We refuse to second-guess the Commonwealth's determinations that these are the most appropriate ways of dealing with the problem.   We conclude, therefore, that the impairment of petitioners' right to enforce the damages waivers is amply justified by the public purposes served by the Subsidence Act.

The judgment of the Court of Appeals is

*Affirmed.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE POWELL, JUSTICE O'CONNOR, and JUSTICE SCALIA join, dissenting.

More than 50 years ago, this Court determined the constitutionality of Pennsylvania's Kohler Act as it affected the property interests of coal mine operators.   *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922).   The Bituminous Mine Subsidence and Land Conservation Act approved today effects an interference with such interests in a strikingly similar manner.   The Court finds at least two reasons why this case is different.   First, we are told, "the character of the governmental action involved here leans heavily against finding a taking."   *Ante*, at 485.   Second, the Court concludes that the Subsidence Act neither "makes it impossible for peti-

---

[33] Because petitioners did not raise the issue before the District Court, the Court of Appeals rejected their attempt to argue on appeal that the Subsidence Act also affects contracts to which the Commonwealth is a party.   See 771 F. 2d, at 718, n. 8.

tioners to profitably engage in their business," nor involves "undue interference with [petitioners'] investment-backed expectations." *Ibid.* Neither of these conclusions persuades me that this case is different, and I believe that the Subsidence Act works a taking of petitioners' property interests. I therefore dissent.

## I

In apparent recognition of the obstacles presented by *Pennsylvania Coal* to the decision it reaches, the Court attempts to undermine the authority of Justice Holmes' opinion as to the validity of the Kohler Act, labeling it "uncharacteristically . . . advisory." *Ante,* at 484. I would not so readily dismiss the precedential value of this opinion. There is, to be sure, some language in the case suggesting that it could have been decided simply by addressing the particular application of the Kohler Act at issue in the case. See, *e. g.,* *Pennsylvania Coal, supra,* at 414 ("If we were called upon to deal with the plaintiffs' position alone, we should think it clear that the statute does not disclose a public interest sufficient to warrant so extensive a destruction of the defendant's constitutionally protected rights"). The Court, however, found that the validity of the Act itself was properly drawn into question: "[T]he case has been treated as one in which the general validity of the [Kohler] act should be discussed." *Ibid.*[1] The coal company clearly had an interest in obtaining a determination that the Kohler Act was unenforceable if it worked a taking without providing for compensation. For

---

[1] The Pennsylvania Supreme Court, in the decision under review, had also determined that the case called for "consideration . . . of the constitutionality of the act itself." *Mahon* v. *Pennsylvania Coal Co.,* 274 Pa. 489, 494, 118 A. 491, 492 (1922). Before this Court, the coal company persisted in its claim that the Pennsylvania statute took its property without just compensation. See Brief for Plaintiff in Error in *Pennsylvania Coal Co.* v. *Mahon,* O. T. 1922, No. 549, pp. 7–8, 16, 19–21, 28–33; Brief for Defendants in Error in *Pennsylvania Coal Co.* v. *Mahon,* O. T. 1922, No. 549, p. 73.

these reasons, I would not find the opinion of the Court in *Pennsylvania Coal* advisory in any respect.

The Court's implication to the contrary is particularly disturbing in this context, because the holding in *Pennsylvania Coal* today discounted by the Court has for 65 years been the foundation of our "regulatory takings" jurisprudence. See *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 127 (1978); D. Hagman & J. Juergensmeyer, Urban Planning and Land Development Control Law 319 (2d ed. 1986) ("Pennsylvania Coal was a monumental decision which remains a vital element in contemporary taking law"). We have, for example, frequently relied on the admonition that "if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal, supra,* at 415. See, *e. g., MacDonald, Sommer & Frates* v. *Yolo County,* 477 U. S. 340, 348 (1986); *Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986, 1003 (1984); *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74, 83 (1980); *Goldblatt* v. *Hempstead,* 369 U. S. 590, 594 (1962); *United States* v. *Central Eureka Mining Co.,* 357 U. S. 155, 168 (1958). Thus, even were I willing to assume that the opinion in *Pennsylvania Coal* standing alone is reasonably subject to an interpretation that renders more than half the discussion "advisory," I would have no doubt that our repeated reliance on that opinion establishes it as a cornerstone of the jurisprudence of the Fifth Amendment's Just Compensation Clause.

I accordingly approach this case with greater deference to the language as well as the holding of *Pennsylvania Coal* than does the Court. Admittedly, questions arising under the Just Compensation Clause rest on ad hoc factual inquiries, and must be decided on the facts and circumstances in each case. See *Penn Central Transportation Co.* v. *New York City, supra,* at 124; *United States* v. *Central Eureka Mining Co., supra,* at 168. Examination of the relevant factors presented here convinces me that the differences be-

tween them and those in *Pennsylvania Coal* verge on the trivial.

## II

The Court first determines that this case is different from *Pennsylvania Coal* because "the Commonwealth of Pennsylvania has acted to arrest what it perceives to be a significant threat to the common welfare." *Ante,* at 485. In my view, reliance on this factor represents both a misreading of *Pennsylvania Coal* and a misunderstanding of our precedents.

## A

The Court opines that the decision in *Pennsylvania Coal* rested on the fact that the Kohler Act was "enacted solely for the benefit of private parties," *ante,* at 486, and "served only private interests." *Ante,* at 484. A review of the Kohler Act shows that these statements are incorrect. The Pennsylvania Legislature passed the statute "as remedial legislation, designed to cure existing evils and abuses." *Mahon* v. *Pennsylvania Coal Co.,* 274 Pa. 489, 495, 118 A. 491, 492 (1922) (quoting the Act). These were *public* "evils and abuses," identified in the preamble as "wrecked and dangerous streets and highways, collapsed public buildings, churches, schools, factories, streets, and private dwellings, broken gas, water and sewer systems, the loss of human life . . . ." *Id.,* at 496, 118 A., at 493.[2] The Pennsylvania Supreme Court recognized that these concerns were "such as to create an emergency, properly warranting the exercise of the police power . . . ." *Id.,* at 497, 118 A., at 493. There can be

---

[2] That these were public "evils and abuses" is further illustrated by the coverage of the Kohler Act, which regulated mining under "any public building or any structure customarily used by the public," including churches, schools, hospitals, theaters, hotels, and railroad stations. *Mahon* v. *Pennsylvania Coal, supra,* at 495, 118 A., at 492. Protected areas also included streets, roads, bridges, or "any other public passageway, dedicated to public use or habitually used by the public," as well as public utility structures, private homes, workplaces, and cemeteries. *Ibid.*

no doubt that the Kohler Act was intended to serve public interests.

Though several aspects of the Kohler Act limited its protection of these interests, see *Pennsylvania Coal*, 260 U. S., at 414, this Court did not ignore the public interests served by the Act. When considering the protection of the "single private house" owned by the Mahons, the Court noted that "[n]o doubt there is a *public* interest even in this." *Id.*, at 413 (emphasis added). It recognized that the Act "affects the mining of coal under streets or cities in places where the right to mine such coal has been reserved." *Id.*, at 414. See also *id.*, at 416 ("We assume . . . that the statute was passed upon the conviction that an exigency existed that would warrant it, and we assume that an exigency exists that would warrant the exercise of eminent domain"). The strong public interest in the stability of streets and cities, however, was insufficient "to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Ibid.* Thus, the Court made clear that the mere existence of a public purpose was insufficient to release the government from the compensation requirement: "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation." *Id.*, at 415.

The Subsidence Act rests on similar public purposes. These purposes were clearly stated by the legislature: "[T]o aid in the protection of the safety of the public, to enhance the value of [surface area] lands for taxation, to aid in the preservation of surface water drainage and public water supplies and generally to improve the use and enjoyment of such lands . . . ." Pa. Stat. Ann., Title 52, § 1406.2 (Purdon Supp. 1986). The Act's declaration of policy states that mine subsidence "has seriously impeded land development . . . has caused a very clear and present danger to the health, safety and welfare of the people of Pennsylvania [and] erodes the

tax base of the affected municipalities." §§ 1406.3(2), (3), (4). The legislature determined that the prevention of subsidence would protect surface structures, advance the economic future and well-being of Pennsylvania, and ensure the safety and welfare of the Commonwealth's residents. *Ibid.* Thus, it is clear that the Court has severely understated the similarity of purpose between the Subsidence Act and the Kohler Act. The public purposes in this case are not sufficient to distinguish it from *Pennsylvania Coal.*[3]

## B

The similarity of the public purpose of the present Act to that in *Pennsylvania Coal* does not resolve the question whether a taking has occurred; the existence of such a public purpose is merely a necessary prerequisite to the government's exercise of its taking power. See *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229, 239–243, 245 (1984); *Berman* v. *Parker,* 348 U. S. 26, 32–33 (1954). The *nature* of these purposes may be relevant, for we have recognized that a taking does not occur where the government exercises its unquestioned authority to prevent a property owner from using his property to injure others without having to compensate the value of the forbidden use. See *Goldblatt* v. *Hemp-*

---

[3] The Court notes that the particulars of the Subsidence Act better serve these public purposes than did the Kohler Act. *Ante,* at 486. This may well be true, but our inquiry into legislative purpose is not intended as a license to judge the effectiveness of legislation. When considering the Fifth Amendment issues presented by Hawaii's Land Reform Act, we noted that the Act, "like any other, may not be successful in achieving its intended goals. But 'whether *in fact* the provisions will accomplish the objectives is not the question: the [constitutional requirement] is satisfied if . . . the . . . [State] Legislature *rationally could have believed* that the [Act] would promote its objective.'" *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229, 242 (1984), quoting *Western & Southern Life Insurance Co.* v. *State Bd. of Equalization,* 451 U. S. 648, 671–672 (1981). Conversely, our cases have never found it sufficient that legislation efficiently achieves its desired objectives to hold that the compensation required by the Fifth Amendment is unavailable.

*stead*, 369 U. S. 590 (1962); *Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915); *Mugler* v. *Kansas*, 123 U. S. 623 (1887). See generally *Penn Central Transportation Co.* v. *New York City*, 438 U. S., at 144–146 (REHNQUIST, J., dissenting). The Court today indicates that this "nuisance exception" alone might support its conclusion that no taking has occurred. Despite the Court's implication to the contrary, see *ante*, at 485–486, and n. 15, the legitimacy of this purpose is a question of federal, rather than state, law, subject to independent scrutiny by this Court. This statute is not the type of regulation that our precedents have held to be within the "nuisance exception" to takings analysis.

The ease with which the Court moves from the recognition of public interests to the assertion that the activity here regulated is "akin to a public nuisance" suggests an exception far wider than recognized in our previous cases. "The nuisance exception to the taking guarantee," however, "is not coterminous with the police power itself," *Penn Central Transportation, supra*, at 145 (REHNQUIST, J., dissenting), but is a narrow exception allowing the government to prevent "a misuse or illegal use." *Curtin* v. *Benson*, 222 U. S. 78, 86 (1911). It is not intended to allow "the prevention of a legal and essential use, an attribute of its ownership." *Ibid.*

The narrow nature of this exception is compelled by the concerns underlying the Fifth Amendment. Though, as the Court recognizes, *ante*, at 491–492, the Fifth Amendment does not prevent actions that secure a "reciprocity of advantage," *Pennsylvania Coal, supra*, at 415, it is designed to prevent "the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him." *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 325 (1893). See also *Penn Central Transportation Co.* v. *New York City, supra*, at 123–125; *Armstrong* v.

*United States,* 364 U. S. 40, 49 (1960). A broad exception to the operation of the Just Compensation Clause based on the exercise of multifaceted health, welfare, and safety regulations would surely allow government much greater authority than we have recognized to impose societal burdens on individual landowners, for nearly every action the government takes is intended to secure for the public an extra measure of "health, safety, and welfare."

Thus, our cases applying the "nuisance" rationale have involved at least two narrowing principles. First, nuisance regulations exempted from the Fifth Amendment have rested on discrete and narrow purposes. See *Goldblatt* v. *Hempstead, supra; Hadacheck* v. *Sebastian, supra; Mugler* v. *Kansas, supra.* The Subsidence Act, however, is much more than a nuisance statute. The central purposes of the Act, though including public safety, reflect a concern for preservation of buildings, economic development, and maintenance of property values to sustain the Commonwealth's tax base. We should hesitate to allow a regulation based on essentially economic concerns to be insulated from the dictates of the Fifth Amendment by labeling it nuisance regulation.

Second, and more significantly, our cases have never applied the nuisance exception to allow complete extinction of the value of a parcel of property. Though nuisance regulations have been sustained despite a substantial reduction in value, we have not accepted the proposition that the State may completely extinguish a property interest or prohibit all use without providing compensation. Thus, in *Mugler* v. *Kansas, supra,* the prohibition on manufacture and sale of intoxicating liquors made the distiller's brewery "of little value" but did not completely extinguish the value of the building. Similarly, in *Miller* v. *Schoene,* 276 U. S. 272 (1928), the individual forced to cut down his cedar trees nevertheless was able "to use the felled trees." *Penn Central Transportation Co.* v. *New York City, supra,* at 126. The

restriction on surface mining upheld in *Goldblatt* v. *Hempstead, supra,* may have prohibited "a beneficial use" of the property, but did not reduce the value of the lot in question. 369 U. S., at 593, 594. In none of these cases did the regulation "destroy essential uses of private property." *Curtin* v. *Benson, supra,* at 86.

Here, petitioners' interests in particular coal deposits have been completely destroyed. By requiring that defined seams of coal remain in the ground, see *ante,* at 476–477, and n. 7, § 4 of the Subsidence Act has extinguished any interest one might want to acquire in this property, for "'the right to coal consists in the right to mine it.'" *Pennsylvania Coal,* 260 U. S., at 414, quoting *Commonwealth ex rel. Keator* v. *Clearview Coal Co.,* 256 Pa. 328, 331, 100 A. 820 (1917). Application of the nuisance exception in these circumstances would allow the State not merely to forbid one "particular use" of property with many uses but to extinguish *all* beneficial use of petitioners' property.[4]

Though suggesting that the purposes alone are sufficient to uphold the Act, the Court avoids reliance on the nuisance exception by finding that the Subsidence Act does not impair petitioners' investment-backed expectations or ability to profitably operate their businesses. This conclusion follows mainly from the Court's broad definition of the "relevant mass of property," *ante,* at 497, which allows it to ascribe to the Subsidence Act a less pernicious effect on the interests of the property owner. The need to consider the effect of regulation on some identifiable segment of property makes all important the admittedly difficult task of defining the relevant

---

[4] *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531 (1914), did not go this far. Though the Court in that case upheld a statute requiring mine operators to leave certain amounts of coal in their mines, examination of the opinion in *Plymouth Coal* reveals that the statute was not challenged as a taking for which compensation was due. Instead, the coal company complained that the statutory provisions for defining the width of required pillars of coal were constitutionally deficient as a matter of procedural due process.

parcel. See *Penn Central Transportation Co.* v. *New York City*, 438 U. S., at 149, n. 13 (REHNQUIST, J., dissenting). For the reasons explained below, I do not believe that the Court's opinion adequately performs this task.

## III

The *Pennsylvania Coal* Court found it sufficient that the Kohler Act rendered it "commercially impracticable to mine certain coal." 260 U. S., at 414. The Court, *ante*, at 498, observes that this language is best understood as a conclusion that certain coal mines could not be operated at a profit. Petitioners have not at this stage of the litigation rested their claim on similar proof; they have not "claimed that their mining operations, or even any specific mines, have been unprofitable since the Subsidence Act was passed." *Ante*, at 496. The parties have, however, stipulated for purposes of this facial challenge that the Subsidence Act requires petitioners to leave in the ground 27 million tons of coal, without compensation therefor. Petitioners also claim that the Act extinguishes their purchased interests in support estates which allow them to mine the coal without liability for subsidence. We are thus asked to consider whether these restrictions are such as to constitute a taking.

## A

The Court's conclusion that the restriction on particular coal does not work a taking is primarily the result of its view that the 27 million tons of coal in the ground "do not constitute a separate segment of property for takings law purposes." *Ante*, at 498. This conclusion cannot be based on the view that the interests are too insignificant to warrant protection by the Fifth Amendment, for it is beyond cavil that government appropriation of "relatively small amounts of private property for its own use" requires just compensation. *Ante*, at 499, n. 27. Instead, the Court's refusal to recognize the coal in the ground as a separate segment of property for takings purposes is based on the fact that the

alleged taking is "regulatory," rather than a physical intrusion. See *ante*, at 488–489, n. 18. On the facts of this case, I cannot see how the label placed on the government's action is relevant to consideration of its impact on property rights.

Our decisions establish that governmental action short of physical invasion may constitute a taking because such regulatory action might result in "as complete [a loss] as if the [government] had entered upon the surface of the land and taken exclusive possession of it." *United States* v. *Causby*, 328 U. S. 256, 261 (1946). Though the government's direct benefit may vary depending upon the nature of its action, the question is evaluated from the perspective of the property holder's loss rather than the government's gain. See *ibid.; United States* v. *General Motors Corp.*, 323 U. S. 373, 378 (1945); *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195 (1910). Our observation that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government," *Penn Central Transportation Co.* v. *New York City, supra*, at 124, was not intended to alter this perspective merely because the claimed taking is by regulation. Instead, we have recognized that regulations—unlike physical invasions—do not typically extinguish the "full bundle" of rights in a particular piece of property. In *Andrus* v. *Allard*, 444 U. S. 51, 66 (1979), for example, we found it crucial that a prohibition on the sale of avian artifacts destroyed only "one 'strand' of the bundle" of property rights, "because the aggregate must be viewed in its entirety." This characteristic of regulations frequently makes unclear the breadth of their impact on identifiable segments of property, and has required that we evaluate the effects in light of the "several factors" enumerated in *Penn Central Transportation Co.*: "The economic impact of the regulation on the claimant, . . . the extent to which the regulation has interfered with investment-backed expectations, [and] the character of the governmental action." 438 U. S., at 124.

No one, however, would find any need to employ these analytical tools where the government has physically taken an identifiable segment of property. Physical appropriation by the government leaves no doubt that it has in fact deprived the owner of all uses of the land. Similarly, there is no need for further analysis where the government by regulation extinguishes the whole bundle of rights in an identifiable segment of property, for the effect of this action on the holder of the property is indistinguishable from the effect of a physical taking.[5] Thus, it is clear our decision in *Andrus* v. *Allard, supra,* would have been different if the Government had confiscated the avian artifacts. In my view, a different result would also follow if the Government simply prohibited every use of that property, for the owner would still have been "deprive[d] of all or most of his interest in the subject matter." *United States* v. *General Motors Corp. supra,* at 378.

In this case, enforcement of the Subsidence Act and its regulations will require petitioners to leave approximately 27 million tons of coal in place. There is no question that this coal is an identifiable and separable property interest. Unlike many property interests, the "bundle" of rights in this coal is sparse. "'For practical purposes, the right to coal consists in the right to mine it.'" *Pennsylvania Coal,* 260

---

[5] There is admittedly some language in *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 130–131 (1978), that suggests a contrary analysis: "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." The Court gave no guidance on how one is to distinguish a "discrete segment" from a "single parcel." It was not clear, moreover, that the air rights at issue in *Penn Central* were entirely eliminated by the operation of New York City's Landmark Preservation Law, for, as the Court noted, "it simply cannot be maintained, on this record, that appellants have been prohibited from occupying *any* portion of the airspace above the Terminal." *Id.,* at 136.

U. S., at 414, quoting *Commonwealth ex rel. Keater* v. *Clearview Coal Co.*, 256 Pa. at 331, 100 A. at 820. From the relevant perspective—that of the property owners—this interest has been destroyed every bit as much as if the government had proceeded to mine the coal for its own use. The regulation, then, does not merely inhibit one strand in the bundle, cf. *Andrus* v. *Allard, supra,* but instead destroys completely any interest in a segment of property. In these circumstances, I think it unnecessary to consider whether petitioners may operate individual mines or their overall mining operations profitably, for they have been denied all use of 27 million tons of coal. I would hold that § 4 of the Subsidence Act works a taking of these property interests.

## B

Petitioners also claim that the Subsidence Act effects a taking of their support estate. Under Pennsylvania law, the support estate, the surface estate, and the mineral estate are "three distinct estates in land which can be held in fee simple separate and distinct from each other . . . ." *Captline* v. *County of Allegheny,* 74 Pa. Commw. 85, 91, 459 A. 2d 1298, 1301(1983), cert. denied, 466 U. S. 904 (1984). In refusing to consider the effect of the Subsidence Act on this property interest alone, the Court dismisses this feature of Pennsylvania property law as simply a "legalistic distinctio[n] within a bundle of property rights." *Ante,* at 500. "Its value," the Court informs us, "is merely a part of the entire bundle of rights possessed by the owner of either the coal or the surface." *Ante,* at 501. See also 771 F. 2d 707, 716 (1985) ("To focus upon the support estate separately . . . would serve little purpose"). This view of the support estate allows the Court to conclude that its destruction is merely the destruction of one "strand" in petitioners' bundle of property rights, not significant enough in the overall bundle to work a taking.

Contrary to the Court's approach today, we have evaluated takings claims by reference to the units of property defined

by state law. In *Ruckleshaus* v. *Monsanto Co.*, for example, we determined that certain "health, safety, and environmental data" was "cognizable as a trade-secret property right under Missouri law," 467 U. S., at 1003, and proceeded to evaluate the effects of governmental action on this state-defined property right.[6] Reliance on state law is necessitated by the fact that "'[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 161 (1980), quoting *Board of Regents* v. *Roth*, 408 U. S. 564, 577 (1972). In reality, the Court's decision today cannot reject this necessary reliance on state law. Rather, it simply rejects the support estate as the relevant segment of property and evaluates the impact of the Subsidence Act by reference to some broader, yet undefined, segment of property presumably recognized by state law.

I see no reason for refusing to evaluate the impact of the Subsidence Act on the support estate alone, for Pennsylvania has clearly defined it as a separate estate in property. The Court suggests that the practical significance of this estate is limited, because its value "is merely part of the bundle of rights possessed by the owner of either the coal or the surface." *Ante*, at 501. Though this may accurately describe the usual state of affairs, I do not understand the Court to mean that one holding the support estate alone would find it worthless, for surely the owners of the mineral or surface es-

---

[6] Indeed, we rejected the claim that the Supremacy Clause allowed Congress to dictate that the effect of its regulation "not vary depending on the property law of the State in which the submitter [of trade-secret information] is located. . . . If Congress can 'pre-empt' state property law in the manner advocated . . . , then the Taking Clause has lost all vitality." *Ruckleshaus* v. *Monsanto Co.*, 467 U. S., at 1012.

tates would be willing buyers of this interest.[7]   Nor does the Court suggest that the owner of both the mineral and support estates finds his separate interest in support to be without value.   In these circumstances, where the estate defined by state law is both severable and of value in its own right, it is appropriate to consider the effect of regulation on that particular property interest.

When held by owners of the mineral estate, the support estate "consists of the right to remove the strata of coal and earth that undergird the surface . . . ."   771 F. 2d, at 715. Purchase of this right, therefore, shifts the risk of subsidence to the surface owner.   Section 6 of the Subsidence Act, by making the coal mine operator strictly liable for any damage to surface structures caused by subsidence, purports to place this risk on the holder of the mineral estate regardless of whether the holder also owns the support estate.   Operation of this provision extinguishes petitioners' interests in their support estates, making worthless what they purchased as a separate right under Pennsylvania law.   Like the restriction on mining particular coal, this complete interference with a property right extinguishes its value, and must be accompanied by just compensation.[8]

## IV

In sum, I would hold that Pennsylvania's Bituminous Mine Subsidence and Land Conservation Act effects a taking of petitioners' property without providing just compensation. Specifically, the Act works to extinguish petitioners' interest

[7] It is clear that under Pennsylvania law, "one person may own the coal, another the surface, and the third the right of support." *Smith* v. *Glen Alden Coal Co.*, 347 Pa. 290, 304, 32 A. 2d 227, 234–235 (1943).

[8] It is therefore irrelevant that petitioners have not presented evidence of "what percentage of the purchased support estates, either in the aggregate or with respect to any individual estate, has been affected by the Act." *Ante*, at 501.   There is no doubt that the Act extinguishes support estates.   Because it fails to provide compensation for this taking, the Act violates the dictates of the Fifth Amendment.

in at least 27 million tons of coal by requiring that coal to be left in the ground, and destroys their purchased support estates by returning to them financial liability for subsidence. I respectfully dissent from the Court's decision to the contrary.[9]

---

[9] Because I would find § 6 of the Subsidence Act unconstitutional under the Fifth Amendment, I would not reach the Contracts Clause issue addressed by the Court, *ante*, at 502–506.