**S T A T E   O F   M I C H I G A N**
**C O U R T   O F   A P P E A L S**

CITY OF DETROIT,

        Plaintiff-Appellee,

v

TRIPLE-A VENTURE, LLC and 139 BAGLEY,

        Defendants-Appellants.

UNPUBLISHED
January 26, 2016

No. 323068
Wayne Circuit Court
LC No. 14-008057-CH

Before: STEPHENS, P.J., and HOEKSTRA and SERVITTO, JJ.

PER CURIAM.

Defendants, Triple-A Venture, LLC (Venture) and 139 Bagley, appeal as of right an order directing immediate demolition of a building owned by Venture and located at 139 Bagley, Detroit, Michigan (the building). We affirm.

Initially, it appears that the issues raised on appeal are moot because the building has already been demolished. An appellate court generally does not decide moot issues. *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). "A case is moot when it presents only abstract questions of law that do not rest upon existing facts or rights. An issue is deemed moot when an event occurs that renders it impossible for a reviewing court to grant relief." *Id.* (citation omitted). However, an issue may be considered not to be moot if it will continue to affect the party in a collateral way. *In re Dodge Estate*, 162 Mich App 573, 584; 413 NW2d 449 (1987). Also, a moot issue may be addressed if it is likely to recur yet evade review. *In re Martin*, 237 Mich App 253, 254; 602 NW2d 630 (1999). Although the building was demolished after this Court denied Venture's motion for a stay, Venture asserts that it wishes to be paid "a fair price for the building, the property, the cost of demolition and the cost of litigation." Whether demolition was properly ordered may affect Venture's efforts to seek recovery of such costs. Also, the issues are likely to recur yet evade review because whenever a building is ordered to be demolished because it presents an imminent danger, it will likely be difficult to obtain appellate review before demolition occurs. Accordingly, we will address the issues raised on appeal.

Venture argues that the trial court abused its discretion in granting injunctive relief to plaintiff, the city of Detroit (the City), by requiring immediate demolition of the building. We disagree. A trial court's decision whether to grant injunctive relief is reviewed for an abuse of discretion. *Mich AFSCME Council 25 v Woodhaven-Brownstown Sch Dist*, 293 Mich App 143,

146; 809 NW2d 444 (2011). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. This Court reviews the trial court's factual findings for clear error. *Id*. "A finding is clearly erroneous if it leaves this Court with the definite and firm conviction that a mistake has been made." *Capitol Props Group, LLC v 1247 Ctr Street, LLC*, 283 Mich App 422, 430; 770 NW2d 105 (2009). "In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

"Injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there is a real and imminent danger of irreparable injury." *Janet Travis, Inc v Preka Holdings, LLC*, 306 Mich App 266, 274; 856 NW2d 206 (2014). The decision whether to grant injunctive relief must be tailored to the facts of the case. *Id*.

> Our Court weighs the following factors when it determines whether the trial court properly issued a permanent injunction: (a) the nature of the interest to be protected, (b) the relative adequacy to the plaintiff of injunction and of other remedies, (c) any unreasonable delay by the plaintiff in bringing suit, (d) any related misconduct on the part of the plaintiff, (e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied, (f) the interests of third persons and of the public, and (g) the practicability of framing and enforcing the order or judgment. [*Id*. (quotation marks and citation omitted).]

Further, a court should "balance the benefit of an injunction to a requesting plaintiff against the damage and inconvenience to the defendant, and will grant an injunction if doing so is most consistent with justice and equity." *Id*. at 274-275.

We note that Venture frames its appellate challenge to the trial court's grant of a permanent injunction around the four factors considered when deciding whether to grant a preliminary injunction. Those four factors are summarized as follows:

> When deciding whether to grant an injunction under traditional equitable principles, a court must consider (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is not issued. [*Mich AFSCME Council 25*, 293 Mich App at 148 (quotation marks and citation omitted).]

"The irreparable-harm factor is considered an indispensible requirement for a preliminary injunction. It requires a particularized showing of irreparable harm." *Id*. at 149 (citations omitted). "[A]n injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural." *Id*. (quotation marks and citations omitted).

The City's underlying claim for which it sought injunctive relief was that the building constituted a public nuisance.

A public nuisance is an unreasonable interference with a common right enjoyed by the general public. The term "unreasonable interference" includes conduct that (1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long-lasting, significant effect on these rights. [*Cloverleaf Car Co v Phillips Petroleum Co*, 213 Mich App 186, 190; 540 NW2d 297 (1995).]

Whether a nuisance exists is generally determined by reference to the facts and circumstances of each case. *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 276; 761 NW2d 761 (2008). "However, at its core, public nuisance includes interference with the public health, the public safety, the public morals, the public peace, the public comfort, and the public convenience in travel." *Id*. (quotation marks and citation omitted). Circuit courts have broad equitable authority to abate nuisances. *Id*. at 275-276. See also *Bonner v City of Brighton*, 495 Mich 209, 229; 848 NW2d 380 (2014) ("It is firmly established that nuisance abatement, as a means to promoting public health, safety, and welfare, is a legitimate exercise of police power and that demolition is a permissible method of achieving that end.") (Citations omitted).

Further, the abatement of nuisances does not amount to an unconstitutional taking of private property.

The federal and state constitutions both proscribe the taking of private property for public use without just compensation. US Const, Am V; Const 1963, art 10, § 2. However, the nuisance exception to the prohibition of unconstitutional takings provides that because no individual has the right to use his or her property so as to create a nuisance, "the State has not 'taken' anything when it asserts its power to enjoin a nuisance like activity." *Keystone Bituminous Coal Ass'n v DeBenedictis*, 480 US 470, 491 n 20; 107 S Ct 1232; 94 L Ed 2d 472 (1987). Indeed, "Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance." *Id*. at 492 n 22. [*Kircher*, 281 Mich App at 272 (citation omitted).]

Therefore, an unconstitutional taking does not occur when a municipal body exercises its legitimate police power to abate a public nuisance on a landowner's property. *Id*.

Venture first contends that the City failed to prove that an imminent danger of irreparable injury existed. We disagree.

The record supported the trial court's determination that the building presented an imminent danger of irreparable injury. The parties agree that the building was damaged in a construction incident in 2005 and that the damage was not remediated as of the 2014. Arthur Edge, the building inspector and supervisor in charge of dangerous buildings and demolitions for the City's Building Safety Engineering Environmental Department, testified about photographs demonstrating that the building had loose bricks and indicating that bricks had fallen from the building. Half of the roof had collapsed, and the upper floors of the building had also partially collapsed. Although Edge did not enter the building, he used a construction device that lifted

-3-

him to the top of the roof. A photograph showed mechanical equipment that was on a beam on the roof, and the beam was resting against the east wall of the building. Edge was concerned about the wall deteriorating from the weather and the mechanical equipment collapsing and possibly endangering the public. A tree was growing up through the collapsed portion of the building, and an elevator shaft was deteriorating at the bottom of the building. Part of the east wall had collapsed, and many bricks were missing from that wall. Numerous open windows and the collapsed roof exposed the building to the elements for many years, causing internal deterioration. With the collapsing of the floors, something could fly out a window and hurt someone walking down the street. Edge believed a portion of the building was likely to fall; the wall above the fifth floor windows was his greatest concern, because the wall could become loose and members of the public could be walking by, as people often park nearby for sporting events and walk down the street. The upper east wall had already deteriorated, and there was a danger of the wall, the equipment, and the steel beam coming down if the wall loosened.

The City also presented the testimony of James Corsiglia, a structural engineer. Corsiglia stated that the building was structurally unsound and that in its then current state, the building should be demolished. Corsiglia determined from Google Earth that more than half of the roof was gone. Additionally, Corsiglia's onsite inspection found that there was water damage on the floors, suggesting that a tremendous amount of water had been pushed through the building. The ceilings attached to the underside of the floors were collapsing throughout the building, further reflecting water damage, and the water would find its way to the basement. Debris, including fallen ceiling pieces, and ash were located throughout the building. The floors were losing their capacity to provide structural stability for the building. Corsiglia explained that water is the enemy of a building. Because the building had been open to the elements for nine years, the damage was compounded because "the longer it's exposed, the weaker it becomes." On the third floor, the northeast corner of the floor was missing and had collapsed. The wall had no structural brace points in the northeast corner from the third floor to the top of the building. The northeast portion of the wall was freestanding from the second floor to the roof, and the wall was not designed to do that; the lack of adequate lateral structural support could cause the wall to fall over and collapse under wind pressure. Boarding up the windows where the floors were missing would increase wind pressure on the wall. Because the roof was gone in that area, Corsiglia concluded that the "wall is structurally inadequate and could fall." He addressed the immediacy of any danger by stating "And there's no way to predict when it's going to fall, except that it doesn't need to fall to become a failure." Also, some old elevator machinery was tied into the exterior wall, and if the machinery were to move, it would bring down the wall with it. The work that was being done on the building at the time of the evidentiary hearing would not help the structural integrity of the building or prevent its possible collapse, nor would it alleviate the capacity issues related to the east wall. The east half of the building was in danger of collapsing. Nothing in the interior of the building was salvageable. Also, there could be no new development on the adjacent property while the building was standing in its current condition. Corsiglia explained: "Construction traffic causes vibration, vibration with being closer to that building. If you vibrate the building you could promote movement, promote a movement that could allow the unprotected exterior walls to then fall." His most direct testimony supporting the immediate danger posed by the building to the public was the fact that he opined that it was subject to partial collapse due to the wind, "But my biggest concern is the wind, the wind, the wind, the wind, the one of three, wind that poses the danger and wind that will cause danger."

This testimony alone supports the court's finding of fact that the building posed an immediate threat to the public.

Although Venture's architectural expert, Ronald Titus, opined that there were steel members embedded in exterior walls, he acknowledged he could not determine whether there was steel inside a wall that ran away from the People Mover. Titus agreed that half of the roof was missing or damaged and that the upper floors had partially collapsed. Titus also acknowledged that photographs taken in 2011 and 2014 of the same window appeared to suggest that bricks had fallen, which would make the building dangerous. James Partridge, a professional engineer who testified for the defense, also agreed that parts of the roof and of the third, fourth, and fifth floors had collapsed. Although Partridge testified that the building was not about to collapse, he admitted that he could not speak about the fourth or fifth floors of the building because he had not been there and had never renovated a building in that condition.

The trial court did not clearly err in finding that the building posed an imminent risk to public safety.

Venture next argues that the City failed to establish that the risk of harm to the City if the demolition order was not issued outweighed the risk of harm to Venture if the demolition order was issued. Venture asserts that the balance of the equities favored Venture rather than the City because the building had been secured from trespassers by a security gate and Venture had hired a contractor to remove or secure loose bricks and to board up windows. Venture contends that the fact that the building is old or aesthetically unpleasing does not justify demolishing it. According to Venture, the harm to Venture is irreparable because the demolition of a building cannot be undone and because, given the age of the building, its demolition takes away Venture's ability to have a building that need not satisfy the current building code.

Venture's arguments are unconvincing. The balance of the equities did not favor Venture. As discussed, the building had been exposed to the elements for nine years without any action taken to protect it from the elements until approximately a week before the evidentiary hearing. Venture's managing member, Anthony Pieroni, acknowledged that he received a settlement check of $1.9 million from the former tenant of the building in connection with damage that occurred to the building in 2005, and that most of this amount was supposed to be used to repair damage to the building. Pieroni admitted that he had not spent any of that money to repair or renovate the building until hiring a contractor to board up windows and remove loose bricks about a week before the evidentiary hearing in 2014. The repairs effectuated by that contractor were expected to cost $15,000 to $20,000. Corsiglia testified that although any building could be renovated with enough money, renovation of this building would require gutting the entire interior, repairing the walls, and demolishing and rebuilding the roof, and that the cost would "definitely" be in the "seven figures" range. Although Titus had proposed a temporary tarping system over the roof area to keep water from entering the building, Venture had not hired anyone to tent the roof at the time of the evidentiary hearing. Titus acknowledged that boarding up windows without sealing the roof would not protect the building from rain coming in through the roof area. A security fence surrounded the building, but it was only two feet from the building in some areas, and members of the public walking nearby would not be safe if the unstable upper wall collapsed. Venture's contention that it has been irreparably harmed by losing a building that did not have to conform to the current building code is belied by

-5-

the testimony of its own expert, Partridge and the City's expert, Corsilgia, where both indicated that any renovation would have to conform with the current building code. Therefore, Venture's contention that the balance of the equities favored Venture lacks merit.

Venture next argues that the public interest was not served by the demolition order because there was no imminent danger and the building had existed in largely the same condition for nine years without any significant deterioration. Venture also emphasizes that the City Council had withdrawn previous demolition recommendations. Venture asserts that the public has an interest in protecting the rights of property owners by giving them a reasonable opportunity to repair or otherwise demonstrate that a property is safe. Venture suggests that the City engaged in "strong-arm tactics" to "rush[]" the administrative and judicial process and force demolition because Venture had refused to sell the property at the price offered by Village Green, a private developer of adjoining property. Venture suggests that the City's conduct was designed to benefit Village Green and that the City's "abusive" behavior infringed the constitutional prohibition on the governmental taking of private property for a private purpose.

Venture's argument on this point is devoid of merit. As discussed, there was ample evidence that the building posed an imminent danger to public safety. Venture's contention that it lacked an adequate opportunity to repair the property is belied by the fact that Venture took no action to effectuate repairs until the week before the evidentiary hearing. Given these circumstances, demolition was a permissible method of abating the nuisance to promote public health, safety, and welfare. See *Bonner*, 495 Mich at 229. Venture's contention that the City engaged in abusive conduct to benefit Village Green and effectuate an unconstitutional taking of private property for a private purpose is unsupported by the record. As discussed, a property owner has no right to use its property to create a public nuisance, and no unconstitutional taking occurs when a municipal body exercises its legitimate police power to abate a nuisance on a landowner's property. *Kircher*, 281 Mich App at 272.

Venture next argues that the City could not establish actual success on the merits of its underlying public nuisance claim. Venture contends that the City could not have succeeded on the merits if Venture had been given adequate time to complete repairs. Venture says that its "failure to achieve compliance within an unrealistic time frame should not have been considered any type of success on the merits favoring the City, especially where the [b]uilding's noncompliance did not pose any actual danger to the public."

This argument lacks merit. As discussed already, the record supported the trial court's determination that the building posed an imminent danger to public safety and that Pieroni failed to make timely repairs. Accordingly, the facts and circumstances supported the trial court's finding of a public nuisance, i.e., an unreasonable interference with public safety. See *Kircher*, 281 Mich App at 276; *Clover Leaf Car Co*, 213 Mich App at 190.

Venture next argues that the trial court abused its discretion in expediting the proceedings and in refusing to hold the record open while Venture continued efforts to repair the building. We disagree. Although the present case involves a permanent injunction, Venture suggests this issue should be treated as analogous to an order requiring the trial on the merits to be expedited and consolidated with the hearing on a motion for a preliminary injunction. See MCR 3.310(A)(2) ("Before or after the commencement of the hearing on a motion for a preliminary

injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing on the motion. . . .”). A trial court's decision concerning a motion to consolidate is reviewed for an abuse of discretion. *Gardner v Stodgel*, 175 Mich App 241, 250; 437 NW2d 276 (1989). “The purpose of consolidation is to promote the convenient administration of justice and to avoid needless duplication of time, effort and expense. Consolidation should not be ordered if a substantial right of a party would be significantly prejudiced.” *Id*. (citation omitted).

The premise of Venture's argument, that there was no imminent danger to the public, is incorrect for the reasons discussed earlier. Venture's contention that it lacked adequate time to complete repairs before the evidentiary hearing is also without merit for reasons previously stated. As of the date of the evidentiary hearing, Venture had not engaged a contractor to cover the exposed roof area or to address the unstable upper wall. We conclude that the trial court did not abuse its discretion in refusing to hold the record open.

Finally, in a similar argument, Venture contends that the trial court erred in ordering demolition without affording Venture additional time to complete ongoing renovations. Venture essentially repeats its arguments from the prior issues but argues further that it should have been allowed to complete repairs because it had a viable repair plan that cost less than the value of the building and that the City's witnesses admitted the building could be made safe if Venture was willing to spend the money to do so. Again, we disagree. “Without question, property owners have a constitutional right of property use, but this does not translate into an absolute constitutional right to repair unsafe structures.” *Bonner*, 495 Mich at 231. Venture contends that it was reasonable to repair the building in this case because the cost of repair was less than the value of the building. But it was not disputed that the cost of repair was less than the value of the building. Corsiglia testified that renovation of this building would “definitely” be in the “seven figures” range. Although Village Green had offered to buy the property for $1 million, an offer that Pieroni rejected, Pieroni acknowledged that in April of 2014, Pieroni and an appraiser said that the fair market value of the property was $222,000. Further, as discussed earlier, the building posed an imminent danger to the public. Pieroni failed to make any repairs or hire a contractor to address the exposed roof area or the unsecured upper wall. Venture has failed to establish that the trial court erred in requiring demolition instead of allowing repairs to proceed. On the facts and circumstances of this case, demolition was a permissible method of abating the public nuisance that existed. See *Bonner*, 495 Mich at 229; *Kircher*, 281 Mich App at 275-276.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Joel P. Hoekstra
/s/ Deborah A. Servitto