*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MOUNT CLEMENS RECREATIONAL BOWL, INC., K.M.I., INC., and MIRAGE CATERING, INC., Individually and on Behalf of All Others Similarly Situated,

      Plaintiffs-Appellants,

v

DIRECTOR OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, CHAIRPERSON OF THE LIQUOR CONTROL COMMISSION, and GOVERNOR,

      Defendants-Appellees.

FOR PUBLICATION
November 17, 2022
9:00 a.m.

No. 358755
Court of Claims
LC No. 21-000126-MZ

Before: HOOD, P.J., and JANSEN and K. F. KELLY, JJ.

PER CURIAM.

Plaintiffs, Mount Clemens Recreational Bowl, Inc., K.M.I., Inc., and Mirage Catering, Inc.,[1] appeal as of right the Court of Claims order denying plaintiffs' motion to transfer the case to the Macomb Circuit Court and granting summary disposition under MCR 2.116(C)(8) to defendants, the Michigan Governor, the Director of the Department of Health and Human Services (DHHS), and the Chairperson of the Liquor Control Commission. Plaintiffs' lawsuit involved allegations of impacts to their properties and businesses from shutdown and other regulatory orders pertaining to food-service establishments and COVID-19. On appeal, plaintiffs contend (1) that a transfer to the Macomb Circuit Court was appropriate because they had a right to a jury trial in the circuit court, (2) that they pleaded an actionable takings claim under the Michigan Constitution, and (3) that they pleaded actionable tort claims. We affirm.

---

[1] Plaintiffs styled their lawsuit as a class action, but class certification was not granted.

## I. DISMISSAL OF MOTION TO TRANSFER

Plaintiffs first contend that the trial court erred by denying their motion to transfer. This issue involves interpretation of the Court of Claims Act, MCL 600.6401 *et seq*. *Doe v Dep't of Transp*, 324 Mich App 226, 231; 919 NW2d 670 (2018). Questions of statutory construction, including of the Court of Claims Act, are reviewed de novo. *Id*.; *Parkwood Ltd Dividend Housing Ass'n v State Housing Dev Auth*, 468 Mich 763, 767; 664 NW2d 185 (2003).

MCL 600.6419(1)(a) states that the Court of Claims "has the following power and jurisdiction":

> To hear and determine any claim or demand, statutory or constitutional, liquidated or unliquidated, ex contractu or ex delicto, or any demand for monetary, equitable, or declaratory relief or any demand for an extraordinary writ against the state or any of its departments or officers notwithstanding another law that confers jurisdiction of the case in the circuit court.

In addition, MCL 600.6419(7) states:

> As used in this section, "the state or any of its departments or officers" means this state or any state governing, legislative, or judicial body, department, commission, board, institution, arm, or agency of the state, or an officer, employee, or volunteer of this state or any governing, legislative, or judicial body, department, commission, board, institution, arm, or agency of this state, acting, or who reasonably believes that he or she is acting, within the scope of his or her authority while engaged in or discharging a government function in the course of his or her duties.

Because plaintiffs sued the individual defendants in their official capacities, the lawsuit is against the state itself. *Mays v Snyder*, 323 Mich App 1, 88; 916 NW2d 227 (2018), aff'd 506 Mich 157 (2020). And MCL 600.6443 indicates that cases are to be heard in the Court of Claims without a jury.

Regarding a motion to transfer, in *Elia Cos, LLC v Univ of Mich Regents*, 335 Mich App 439, 457; 966 NW2d 755 (2021), lv pending on app ___ Mich ___; 967 NW2d 237 (2021), the Court stated that "the bare fact that plaintiff filed its complaint in circuit court is irrelevant . . . . Rather, the dispositive factor is whether plaintiff's . . . claim may actually be *maintained* in circuit court." (Emphasis added.)[2]

Plaintiffs, in arguing that their takings claim may be pursued in circuit court, cite MCL 600.6421(1), which states:

---

[2] Plaintiffs originally filed their complaint in circuit court, and it was transferred to the Court of Claims.

Nothing in this chapter eliminates or creates any right a party may have to a trial by jury, including any right that existed before November 12, 2013. *Nothing in this chapter deprives the circuit, district, or probate court of jurisdiction to hear and determine a claim for which there is a right to a trial by jury as otherwise provided by law*, including a claim against an individual employee of this state for which there is a right to a trial by jury as otherwise provided by law. Except as otherwise provided in this section, if a party has the right to a trial by jury and asserts that right as required by law, the claim may be heard and determined by a circuit, district, or probate court in the appropriate venue. [Emphasis added.]

In assessing whether this particular statute applies, "the question is not whether there would ordinarily be a right to a jury trial as between private parties but whether there is a specific right to a jury trial *against the state*." *Elia Cos*, 335 Mich App at 457. In *Elia Cos*, *id*. at 458, the Court concluded that "the Court of Claims has exclusive jurisdiction over plaintiff's breach-of-contract claim seeking money damages" against the state.

The complaint in the present case makes clear that plaintiffs are seeking money damages under Const 1963, art 10, § 2.[3] In *Hill v State*, 382 Mich 398, 400; 170 NW2d 18 (1969), the

plaintiffs filed a complaint with the Court of Appeals in which they sought an order to require defendant to show cause why a writ of mandamus should not issue directed to the State Highway Commission and commanding it to institute an action to ascertain and determine the damages to plaintiffs' property as a result of establishment of the right-of-way and construction of the I-94 Expressway.

"[T]he Court of Appeals denied the complaint without prejudice to the right of plaintiffs to file a claim with the Court of Claims," and the Supreme Court granted leave. *Id*. at 402. The Supreme Court said:

If plaintiffs' claims have merit, they are of such a nature as to establish a constructive rather than an actual taking of plaintiffs' property. This is the crux of the case. Determination of that question (it being the contention of defendant that there has been no taking whatsoever) can come only after a full testimonial hearing. In circumstances such as these, plaintiffs' remedy is by an action in the Court of Claims in order that a determination may be made as to whether a taking has occurred and, if so, plaintiffs' damage from the same. [*Id*. at 405.]

---

[3] Const 1963, art 10, § 2, states:

Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law. . . . Compensation shall be determined in proceedings in a court of record.

The "plaintiffs concede[d] they ha[d] a remedy in the Court of Claims, [but] they assert[ed] that it [was] not adequate because the amount of damages cannot be determined by a jury in such a proceeding." *Id*.

The Supreme Court noted that the 1908 Constitution did not mandate, and the 1963 Constitution does not mandate, a jury trial for condemnation proceedings. *Id*. at 406. It also noted that "some condemnation statutes provide for different modes of assessing damages than by a jury, such as by three commissioners." *Id*.; see also MCL 213.183. The Court concluded:

> Since neither the Constitution of 1908 nor 1963 provides a constitutional right to a jury in a condemnation hearing and since there is statutory authority for non-jury [condemnation] proceedings by the Highway Commission, the plaintiffs' claim of a right to a determination of damages by a jury is without merit. [*Hill*, 382 Mich at 406.]

Plaintiffs contend that the present case is not analogous to *Hill* because, in the present case, there is no "statutory authority for non-jury proceedings" such as was present in that case. Plaintiffs rely heavily on certain provisions of the Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq*. MCL 213.51(e) states that " '[c]onstructive taking' or 'de facto taking' means conduct, other than regularly established judicial proceedings, sufficient to constitute a taking of property within the meaning of section 2 of article X of the state constitution of 1963." MCL 213.52(2) states:

> If property is to be acquired by an agency through the exercise of its power of eminent domain, the agency shall commence a condemnation action for that purpose. An agency shall not intentionally make it necessary for an owner of property to commence an action, including an action for constructive taking or de facto taking, to prove the fact of the taking of the property.

And MCL 213.62(1) states:

> A plaintiff or defendant may demand a trial by jury as to the issue of just compensation pursuant to applicable law and court rules. The jury shall consist of 6 qualified electors selected pursuant to chapter 13 of Act No. 236 of the Public Acts of 1961, as amended, being sections 600.1301 to 600.1376 of the Michigan Compiled Laws, and shall be governed by court rules applicable to juries in civil cases in circuit court.

Plaintiffs' attempt to rely on these provisions is unavailing because plaintiffs were not proceeding under the UCPA.[4] As stated in *Miller Bros v Dep't of Natural Resources*, 203 Mich App 674, 690; 513 NW2d 217 (1994):

---

[4] In addition, the right to a jury trial under the UCPA extends only to the issue of just compensation, not to the issue of necessity. See *Kalamazoo v KTS Indus, Inc*, 263 Mich App 23, 33-34; 687 NW2d 319 (2004).

[W]hen the state affects [sic] a taking merely by depriving an owner of all beneficial use of property, the state does not *acquire* the property "taken." Such a taking may violate the constitution, but it does not violate the UCPA. Consequently, the state cannot be compelled to invoke the UCPA. And if it cannot be forced to proceed under the statute, then the UCPA's provision regarding attorney fees is not applicable.

In other words, the UCPA is not applicable to plaintiffs' claims because it is not in dispute that defendants did not acquire plaintiffs' property. The other statutes relied upon by plaintiffs also speak to the *acquisition* of property by the state. See MCL 213.1 and MCL 213.23.[5]

In *Lim v Mich Dep't of Transp*, 167 Mich App 751, 753; 423 NW2d 343 (1988), the defendant relocated the plaintiff's driveway, and the "plaintiff alleged that defendant's actions and omissions resulted in a de facto taking of his property without just compensation." This Court stated that "[t]he Court of Claims is the proper forum in which to seek redress where a plaintiff alleges an already accomplished inverse condemnation by the State of Michigan." *Id*. at 754. It continued:

Plaintiff argues that in enacting the UCPA the Legislature expressly conferred jurisdiction upon the circuit court to hear claims of inverse condemnation initiated by aggrieved property owners. Plaintiff is mistaken. The UCPA has no application to inverse condemnation actions initiated by aggrieved property owners. Instead, the UCPA only governs actions initiated *by an agency* to acquire property on the filing of a proper complaint and after the agency has made a good-faith written offer to purchase the property. The agency must be authorized by law to condemn property.

Finally, plaintiff argues that the right to just compensation is constitutional and not contractual or tortious in nature and, therefore, because the claim is grounded in the constitution it should be adjudicated in a court created by the constitution and not one created by the Legislature. We find plaintiff's argument to be without merit. [*Id*. at 755 (citations omitted).]

Plaintiffs contend that this Court need not follow *Lim* because it is not strictly binding under MCR 7.215(J)(1) ("A panel of the Court of Appeals must follow the rule of law established

---

[5] At any rate, in *Miller Bros*, 203 Mich App at 687, the Court stated that the UCPA "defines the exclusive means by which government is empowered to judicially condemn and acquire property." In *Kalamazoo*, 263 Mich App at 38, the Court stated:

[T]he purpose of the UCPA is to set forth the procedures by which a public or private agency exercises the right of eminent domain conferred on it by another source . . . . Moreover, the UCPA . . . unambiguously states in MCL 213.75 that it sets forth the exclusive procedures to be followed by an agency seeking to condemn property under the power of eminent domain.

by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule."). But even though *Lim* was issued before November 1, 1990, it still has precedential value. See *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019). Viewing the UCPA and the other statutes cited by plaintiff in connection with *Miller Bros*, 203 Mich App at 687, 690, *Kalamazoo v KTS Indus, Inc*, 263 Mich App 23, 38; 687 NW2d 319 (2004), and *Hill*, 382 Mich at 406, we conclude that there is no basis to conclude that the holding of *Lim* is no longer good law.

## II. DISMISSAL OF TAKINGS CLAIM

Plaintiffs next argue that the trial court erred by granting defendants' motion for summary disposition regarding plaintiffs' regulatory-takings claim.

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). As for motions brought under MCR 2.116(C)(8):

> A motion under [this subrule] tests the legal sufficiency of the complaint. All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant. A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. When deciding a motion brought under this section, a court considers only the pleadings. [*Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999) (quotation marks and citations omitted).]

Const 1963, art 10, § 2, states:

> Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law. . . . Compensation shall be determined in proceedings in a court of record.

In *Ypsilanti Fire Marshal v Kircher*, 273 Mich App 496, 555 n 22; 730 NW2d 481 (2007), remanded on other grounds 480 Mich 910 (2007), the Court stated that "[t]he Takings Clause of the Fifth Amendment is substantially similar to the Takings Clause of the Michigan Constitution, and the two provisions should generally be interpreted coextensively[.]" (Citation omitted.) However, the Michigan provision has sometimes been interpreted more broadly than the federal one. *AFT Mich v State of Michigan*, 497 Mich 197, 217-218; 866 NW2d 782 (2015), aff'd 497 Mich 197 (2015); *Gym 24/7 Fitness, LLC v Michigan*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket No. 355148); slip op at 12, lv pending on app.

In *Cummins v Robinson Twp*, 283 Mich App 677, 707; 770 NW2d 421 (2009), this Court stated that there are two types of per se regulatory takings: instances wherein the government causes a permanent physical invasion onto property and instances wherein the government deprives an owner of *all* economically beneficial use of property. It stated that, apart from these two narrow categories, alleged regulatory takings are governed by a test from *Penn Central Transp*

*Co v New York City*, 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978). *Cummins*, 283 Mich App at 707. Plaintiffs do not dispute that the two narrow categories are inapplicable here.

The parties dispute whether the *Penn Central* test need be applied. Of import is the recent case of *Gym 24/7 Fitness*. In that case, the plaintiff ("the Gym") "filed suit in an individual capacity and as a representative of a putative class of plaintiffs comprised of gyms, fitness centers, recreation centers, sports facilities, exercise facilities, exercise studios, and other similarly-situated businesses" in certain counties. *Gym 24/7 Fitness*, ___ Mich App at ___; slip op at 1 n 1. The Gym alleged

> an unconstitutional taking of its business property by operation of Executive Orders [(EOs)] issued by the Governor that temporarily shuttered the business in response to the COVID-19 pandemic. The Gym demanded "just compensation" for the taking of its private property that resulted from the closure. [*Id*. at ___; slip op at 1.]

The Court of Claims denied the defendant's motion for summary disposition, and this Court reversed. *Id*. at ___; slip op at 1-2.

The Gym had conceded that EOs were issued for a public purpose but had argued that constitutional principles required that fitness centers be compensated for the diminution in value of their property interests. *Id*. at ___; slip op at 3-4. On appeal, the Gym argued that,

> "[u]nder takings jurisprudence, whether the taking by the government was reasonable or unreasonable is legally irrelevant." The Gym explain[ed] that "[g]overnments can, almost always, take private property; [but] they commit an actionable wrong when they fail to pay just compensation." [*Id*. at ___; slip op at 7 (first brackets in original).]

This Court stated that

> the primary question presented in this appeal is whether the business owner of private property is entitled to just compensation under either the state or federal Takings Clause when the government properly exercises its police power to protect the health, safety, and welfare of its citizens during a pandemic by temporarily closing the owner's business operations. [*Id*. at ___; slip op at 9.]

The Court in *Gym 24/7 Fitness* analyzed cases discussing the state's police power to react to health emergencies and whether such reactions and restrictions comported with constitutional principles of due process. *Id*. at ___; slip op at 10-11. The Court emphasized, however, that the Gym was *not* making a due-process argument but was relying on takings principles. *Id*. at ___; slip op at 11. The Court discussed takings in general and stated:

> To summarize, there are physical takings and regulatory takings. A physical taking of private property is a categorial taking that requires the payment of just compensation. A regulatory taking involving the deprivation of *all* economically productive or beneficial use of property is also a categorical taking, requiring the payment of just compensation. *The second type of regulatory taking—a*

*noncategorical taking—is one that is determined upon application of the Penn Central balancing test*. Additionally, inverse condemnation arises when the government takes property, either by physical invasion or regulation, absent formal condemnation proceedings. Finally, a taking can be either temporary or permanent. [*Id*. at ___; slip op at 14-15 (second emphasis added).]

In its analysis, the Court first noted "that to the best of our knowledge, every federal court and state appellate court that has addressed a takings claim stemming from the government's closure of a business as a safeguard against the spread of COVID-19 has rejected the claim." *Id*. at ___; slip op at 15. It cited 17 cases in support, stating, "We now join those courts and reject the Gym's claim that its property was taken absent just compensation in violation of the Taking Clauses of the state and federal constitutions." *Id*. at ___; slip op at 15.

With regard to the *Penn Central* balancing test, the Court stated:

*Next, we hold as a matter of law that there was no regulatory taking under [the] Penn Central analysis*. With respect to the *Penn Central* balancing test, the first two factors—economic impact of the EOs and their interference with reasonable investment-backed expectations—weigh in favor of the Gym because its business was in fact shuttered under the EOs, but we do not give those factors all that much weight because the economic impact and the interference with business expectations arising from the closure orders were short lived. Moreover, the third factor—the character of the government's action—was compelling in that the aim of the EOs was to stop the spread of COVID-19, which our Supreme Court described as "the most threatening public-health crisis of modern times" . . . that "has resulted[] in significant numbers of persons suffering serious illness or death." *In re Certified Questions from the United States Dist Court,* [*Western Dist of Mich, Southern Div*,] 506 Mich [332, 337-338; 958 NW2d 1 (2020.] And, once again, the Gym accepted that the Governor's EOs were issued solely for a public purpose, and it did not contest the prudence of the Governor's actions[6] or her authority to issue the EOs. Lending further support for our stance that the character of the Governor's actions strongly favors the State, or perhaps actually demands that we find no taking, is language in precedent issued by the United States Supreme Court.

In *Lucas* [*v South Carolina Coastal Council*], 505 US [1003, 1029; 112 S Ct 2886; 128 L Ed 2d 798 (1992)], the Supreme Court indicated that just compensation is not owed to a property owner for an alleged taking that arises from a law or decree that does nothing more "than duplicate the result that could have been achieved in the courts . . . by the State under its . . . power to abate nuisances that affect the public generally, *or otherwise*." (Emphasis added.) The Supreme Court then noted, "The principal 'otherwise' that we have in mind is litigation absolving the State . . . of liability for the destruction of real and personal property, in cases of actual necessity, to prevent the spreading of a fire *or to forestall other*

---

[6] As discussed *infra*, caselaw has indicated that the actual, factual legitimacy of the government's actions is not a proper consideration in a takings analysis.

*grave threats to the lives . . . of others.*"  *Id*. at 1029 n 16 (quotation marks and citations omitted; emphasis added).  The purpose of the EOs was to forestall the spread of COVID-19 that had hospitalized and killed thousands of Michiganders. [*Gym 24/7 Fitness*, ___ Mich App at ___; slip op at 17-18.]

The Court in *Gym 24/7 Fitness* quoted with approval a passage from *Keystone Bituminous Coal Ass'n v DeBenedictis*, 480 US 470, 491-492; 107 S Ct 1232; 94 L Ed 2d 472 (1987).  *Gym 24/7 Fitness*, ___ Mich App at ___; slip op at 18.  The *Keystone* Court, in that passage, stated:

> The Court's hesitance to find a taking when the State merely restrains uses of property that are tantamount to public nuisances is consistent with the notion of "reciprocity of advantage" . . . .  Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property.  While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others.  These restrictions are properly treated as part of the burden of common citizenship.  Long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community, and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it. [*Keystone Bituminous Coal Ass'n*, 480 US at 491-492 (quotation marks and citations omitted).]

The Court in *Gym 24/7 Fitness* stated, "In light of the precedent, we cannot conclude that the Gym has a viable takings case under the *Penn Central* balancing test."  *Gym 24/7 Fitness*, ___ Mich App at ___; slip op at 18.

The only consideration that could, at least theoretically, distinguish the present case from the case of *Gym 24/7 Fitness* is that plaintiffs in the present case did in fact argue that the regulations and EOs at issue were not actually warranted.  However, this argument must be viewed in context.  Plaintiffs emphatically state in their primary appellate brief that the government's purpose in making the restrictive regulations is not pertinent to a regulatory-takings analysis under *Penn Central*.  They state that whether the EOs were "arbitrary, invalid exercises of the police power" "is ultimately irrelevant to the regulatory taking analysis."  And caselaw supports this.  See, e.g., *Lingle v Chevron USA, Inc*, 544 US 528, 544; 125 S Ct 2074; 161 L Ed 2d 876 (2005) ("Rather, the gravamen of Chevron's claim is simply that Hawaii's rent cap will not actually serve the State's legitimate interest in protecting consumers against high gasoline prices.  Whatever the merits of that claim, it does not sound under the Takings Clause."); see also *Dorman v Twp of Clinton*, 269 Mich App 638, 646 n 23; 714 NW2d 350 (2006) ("[T]he determination of whether a regulation fails to 'substantially advance legitimate state interests' has no part in the takings analysis.").  Plaintiffs contend that the only pertinent question regarding the government's action in the context of a *Penn Central* analysis is whether it burdens citizens equally.  But plaintiffs' authority for this proposition does not adequately support their position that their takings claim should proceed.  They cite *K & K Constr, Inc v Dep't of Environmental Quality*, 267 Mich App 523; 705 NW2d 365 (2005).  In that case, the Court, discussing *Penn Central*, indicated that "regulation in and of itself does not constitute a taking if it applies to a widespread group of landowners."  *Id*. at 560.  The Court indicated that the wetlands regulations in that case applied to

-9-

all similarly situated landowners and could not be characterized as directed at the plaintiffs. *Id*. at 562; see also *Cummins*, 283 Mich App at 720 ("Here, the township enforced the statewide building code and its provisions regarding flood-plain construction that apply equally to all landowners with property similarly situated in flood-prone areas."). Similarly, the actions challenged here applied to all similarly situated property owners.

Also, in *Gym 24/7 Fitness*, the Court stated:

> To be clear, the Gym does not believe that the closure of fitness centers was reasonable. But the Gym's theory of the case is that it is entitled to just compensation regardless of the reasonableness of the EOs. In its brief on appeal, the Gym notes that it provided documentary evidence in the form of a study that demonstrated that shuttering gyms and fitness centers was unnecessary and that the risk of transmitting COVID-19 at such facilities was no greater than at other businesses involved in indoor activities. The Gym contends that the State's argument to the contrary was not supported by any proper documentary evidence and that even if the hearsay references cobbled together by the State and obtained from the Internet can be considered, it minimally created a genuine issue of material fact on the matter. Nevertheless, the Gym indicates that this underlying factual dispute "misses the pertinent point" and is irrelevant. And the Gym emphasizes that "[t]his suit does not seek to contest whether Governor Whitmer's decision to issue the [EOs] . . . were [sic] prudent." [*Gym 24/7 Fitness*, ___ Mich App at ___ n 7; slip op at 10 n 7.]

Similarly, plaintiffs in the current case, *for purposes of the regulatory-takings claim*, are not arguing on appeal that the EOs were imprudent.

The upshot is that the case of *Gym 24/7 Fitness* is not distinguishable from the present case. Even if one could argue that the Court in *Gym 24/7 Fitness* intermingled, to some extent, concepts of taking and governmental necessity, *Gym 24/7 Fitness* is binding caselaw regarding how to view the COVID-19 regulations in Michigan. Further, even if one looks to the caselaw, such as *K & K Constr*, provided by plaintiffs, it does not provide a path to appellate relief. Plaintiffs argue that discovery is needed, but in *Redmond v Heller*, 332 Mich App 415, 448; 957 NW2d 357 (2020), the Court stated that "summary disposition may still be appropriate before the conclusion of discovery if there is no fair likelihood that further discovery would yield support for the nonmoving party." Such is the case here.

III. DISMISSAL OF TORT CLAIMS

Lastly, plaintiffs argue that the court erred by granting defendants' motion for summary disposition regarding plaintiffs' tort claims for alleged interference with business and contractual relationships.

MCL 691.1407(5) states that "the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." In *Mack v Detroit*, 467 Mich 186, 195 n 8; 649 NW2d 47 (2002), the Court stated:

The five statutory exceptions to governmental immunity are the "highway exception," MCL 691.1402, the "motor vehicle exception," MCL 691.1405, the "public building exception," MCL 691.1406, the "proprietary function exception," MCL 691.1413, and the "governmental hospital exception," MCL 691.1407(4).

A "plaintiff must plead her case in avoidance of immunity." *Id*. at 198. "A plaintiff pleads in avoidance of governmental immunity by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary function." *Id*. at 204. Plaintiffs did not state a claim fitting within a statutory exception and did not plead anything occurring during a proprietary function.

Rather, plaintiffs make an argument about "ultra vires" activities. In *Coleman v Kootsillas*, 456 Mich 615, 619; 575 NW2d 527 (1998), the Court stated:

> Whenever a governmental agency engages in an activity which is not expressly or impliedly mandated or authorized by constitution, statute, or other law (i.e., an *ultra vires* activity), it is not engaging in the exercise or discharge of a governmental function. The agency is therefore liable for any injuries or damages incurred as a result of its tortious conduct. [Quotation marks and citations omitted.]

Plaintiffs contend that the Governor engaged in ultra vires activity because, in *In re Certified Questions*, 506 Mich at 347, 372, the Court ruled that the Governor did not have the authority to declare a state of emergency beyond April 30, 2020. But the Governor was clearly acting, at the very least, under implied authority, even if the Supreme Court later ruled against that authority. Justice Markman, in fact, acknowledged that the Governor's interpretation of the Emergency Powers of the Governor Act of 1945 (the EPGA), MCL 10.31 *et seq.*, was correct, but then went on to conclude that the statute was unconstitutional. *Id*. at 356-357 (opinion of MARKMAN, J.). He stated that, as a consequence, "the EPGA cannot *continue* to provide a basis for the Governor to exercise emergency powers." *Id*. at 385 (opinion of MARKMAN, J.) (emphasis added). The actions by the Governor, subject to a reasonable dispute needing to be resolved by the Michigan Supreme Court in a lengthy and divided opinion, were not ultra vires. In addition, DHHS was authorized to issue its own regulations, and plaintiffs do not argue otherwise. No basis for reversal is apparent.[7]

---

[7] Even disregarding the question of governmental immunity, plaintiffs acknowledge in their complaint that in *CMI Int'l, Inc v Intermet Int'l Corp*, 251 Mich App 125, 131; 649 NW2d 808 (2002), the Court stated:

> [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another. [Quotation marks and citation omitted.]

Affirmed.

/s/ Noah P. Hood
/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly

---

No malice or nefarious purpose was alleged. And the actions by the Governor, subject to a reasonable dispute needing to be resolved by the Michigan Supreme Court, were not per se wrongful. See, e.g., *Prysak v R L Polk Co*, 193 Mich App 1, 12-13; 483 NW2d 629 (1992) ("A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances."). In addition, plaintiffs' argument about the alleged unconstitutional taking providing a basis to avoid governmental immunity does not make sense because that claim pertained to a different count of the complaint.